UNITED STATES DISTRICT COURT

                  EASTERN DISTRICT OF CALIFORNIA

                            --o0o--

UNITED STATES OF AMERICA,      )  Case No. 2:07-cr-00164-MCE
                               )  formerly 2:07-mj-00102-DAD
                Plaintiff,     )
                               )  Sacramento, California
        vs.                    )  Thursday, May 3, 2007
                               )  2:41 P.M.
TIEN TRUONG NGUYEN,            )
                               )  Hearing re: arraignment;
                Defendant.     )  detention hearing.
_____ )

                    TRANSCRIPT OF PROCEEDINGS
                 BEFORE THE HONORABLE DALE A. DROZD
                  UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For Plaintiff:                 ROBIN R. TAYLOR
                               U.S. Attorney's Office
                               501 I Street, Suite 10-100
                               Sacramento, CA   95814
                               (916) 554-2900

For Defendant:                 MICHAEL K. CERNYAR
                               Law Office, Michael K. Cernyar
                               400 Oceangate, 8th Floor
                               Long Beach, CA   90802
                               (562) 216-2940

Court Recorder:                CASEY SCHULTZ
                               U.S. District Court
                               501 I Street, Suite 4-200
                               Sacramento, CA   95814
                               (916) 930-4193

Transcription Service:         Petrilla Reporting &
                                 Transcription
                               5002 - 61st Street
                               Sacramento, CA   95820
                               (916) 455-3887

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

SACRAMENTO, CALIFORNIA, THURSDAY, MAY 3, 2007, 2:41 P.M.


          THE CLERK:  Calling Criminal Case 07-0164-MCE, United States v. Tien Truong Nguyen.  Your Honor, this matter is on calendar for an arraignment and detention hearing.

          MS. TAYLOR:  Good afternoon, Your Honor.  Robin Taylor on behalf of the United States.

          MR. CERNYAR:  Good afternoon, Your Honor.  Michael Cernyar appearing for Mr. Nguyen who is present and in custody.

          Your Honor, may I have a moment?

          THE COURT:  Yes.

     (Pause)

          MR. CERNYAR:  Thank you, Your Honor.

          THE COURT:  Mr. Nguyen, you have the right to counsel in these proceedings.  In this regard, you have the right to retain counsel of your own choosing, which you've exercised in retaining Mr. Cernyar to represent you.  Should at some point you be unable to afford retained counsel, you could apply to the Court for appointment of counsel, and if appropriate, the Court would appoint counsel to represent you at that time.

          Mr. Cernyar, has Mr. Nguyen received a copy of the indictment that was returned April 26th, 2007 in Criminal Case No. 07-0164-MCE, has he reviewed that indictment, and do you waive its further reading on his behalf?

          MR. CERNYAR:  Yes, I do, Your Honor.

THE COURT:  Mr. Nguyen, you have the right to remain silent in these proceedings.  You're not required to make any statement here today, and anything you do say may be used against you.

You've been charged in that indictment in five counts, along with a forfeiture allegation.  Count one charges you with conspiracy to commit computer fraud, an access device fraud in violation of 18 USC Section 317.  Count two charges you with access device fraud in violation of 18 USC Section 1029(a)(2).

Count three charges possession of more than 15 unauthorized access devices in violation of 18 USC Section 1029(a)(3).  In count four you're charged with aggravated identity theft in violation of 18 USC Section 1028(A)(a)(1).  And in count five, you're charged with being a convicted felon in possession of a firearm and ammunition in violation of 18 USC Section 922(g)(1).

In addition, there is a forfeiture allegation seeking criminal forfeiture of the property listed in the indictment under 18 USC Section 982(A)(2)(b), and 18 USC Section 1029(C)(1)(c).

If convicted of these charges, counts one and two both carry with them maximum possible punishments of up to five years imprisonment, a fine of up to $250,000, or not more than the gross gain, or gross loss involved in the offense, or both

fine and imprisonment, and a three year term of supervised release.

Counts three and five carry with them maximum punishments of up to 10 years imprisonment, fine of up to $250,000, or in the case of count three, or not more than the gross gain or gross loss associated with the offense, or both fine and imprisonment, and three year term of supervised release.

And finally, count four carries with it a punishment of not less than two years imprisonment, a fine of up to $250,000, or both fine and imprisonment -- I'm sorry, the fine there is again $250,000 or not more than the gross gain or gross loss associated with the offense, or both fine and imprisonment, a three year term of supervised release.

All five counts carry with them the mandatory $100 special assessment upon conviction, and the forfeiture allegation seeks criminal forfeiture of the property listed in that allegation of the indictment.

And Mr. Cernyar, does Mr. Nguyen wish to enter pleas of not guilty and demand a jury trial?

MR. CERNYAR:  Yes, Your Honor.

THE COURT:  Those pleas of not guilty and demand for a jury trial will be entered on the Court's record.  How do the parties wish this matter to be scheduled before Judge England?

MS. TAYLOR:  Your Honor, if I might recommend, I

hadn't confirmed this with Mr. Cernyar, but based on the complexity of this case, the more than four computer hard drives, and voluminous information which I can document, it might make sense to set as a status conference before Judge England, and I could provide a basis for excludable time. If there's a date that's convenient for Mr. Cernyar, he typically hears cases on Thursday at 9:00 a.m.

THE COURT: What's your position in that regard, Mr. Cernyar, a status conference before Judge England to address scheduling with the assigned District Judge, or the other alternative is to set a trial confirmation and trial date right off the bat within a very short period of time, or a relatively short period of time.

MR. CERNYAR: I think we should do the status conference, Your Honor.

THE COURT: All right. What have we got down there over the next few weeks, Pete, before Judge England?

THE CLERK: Your Honor, he has Thursdays are available.

THE COURT: Every Thursday.

MR. CERNYAR: May 24th?

THE COURT: Three weeks?

MS. TAYLOR: If the defense lawyer is agreeable, I'm out of town that day, it might be better if I were present. The 31st is available, or the week before, the 17th.

**1**    MR. CERNYAR:  The 31st would be fine, Your Honor.

**2**    MS. TAYLOR:  Thank you.

**3**    THE COURT:  Is the 31st available, Pete?

**4**    THE CLERK:  Yes, Your Honor, at 9:00 a.m.

**5**    THE COURT:  May 31st at 9:00 a.m. for status

**6** conference.  And Mr. Cernyar, would you concur with Ms.

**7** Taylor's assessment that based upon the amount of discovery to

**8** be provided and the complexity of that discovery, that it would

**9** be appropriate to exclude the period of time from today's date

**10** to the date of the status conference in order to provide you

**11** with reasonable time to prepare?

**12**    MR. CERNYAR:  I agree, Your Honor.

**13**    THE COURT:  All right.  Based upon the

**14** representations of counsel, I find that the interests of

**15** justice compel the exclusion of time from today's date to the

**16** May 31st status conference date before Judge England, and I

**17** therefore exclude that period of time from the Speedy Trial Act

**18** calculation under 18 USC Section 3161(H)(a)(b)(4), Local Code

**19** T-4 in order to allow defense counsel reasonable time to

**20** prepare.

**21**    What is the government's position with respect to Mr.

**22** Nguyen's custody status?

**23**    MS. TAYLOR:  Your Honor, the government moves for

**24** detention on the basis of danger and flight and the Pretrial

**25** Services report and I have additional information to provide

the Court when the Court would permit it.

THE COURT:  And how did you wish to present that, by proffer?

MS. TAYLOR:  My preference would be to do it by proffer, at least initially.  I do have Special Agent Korbs with me here from the Secret Service, but certainly it would seem to make sense to do it by proffer.

THE COURT:  All right.  Why don't you start with a proffer.

MS. TAYLOR:  Based on the information in the Pretrial Services report and the testimony you would hear from Special Agent Korbs, the government submits that there are not conditions that would reasonably assure the safety of others, or members of the community, or to assure the defendant's appearance in court.

There are three principal reasons why the government proffers this argument.  The first is the defendant's ongoing and continuous drug use.  He is using meth on a nearly daily basis, as has been stated to the Pretrial Services officer, and this is borne out by statements from his girlfriend, and even his own statements that he does use meth.

During the execution -- or during the evidence collection part of this case, user quantities of meth were found in Mr. Nguyen's room, along with pipes and an electronic scale.  The defendant too also has felony convictions both for

fraud and for drug use.  He has to prior felony convictions.
He has one when he was a juvenile, but I won't focus on that,
and for narcotics possession and a fraud case, as demonstrated
in his rap sheet.

In addition, in this particular case, despite the
felony convictions, the defendant was found in a room with a
shotgun in plain view.  But in addition to that, he had a
sophisticated surveillance system, similar to like a multi-
plexer system where you can see multiple views with cameras.

And this was the case, even though he had indicated
to pretrial that he had only resided at that particular
location at Gerber Road for a short time.

Some of the things I also would want to point the
Court's attention to in addition to the firearm, is that the
defendant made false statements to the Pretrial Services
officer in his very first meeting on items that are very
important, both for determining whether he will appear in
court, and whether he is a danger.

First, he lied about where he was living.  He said he
lived at 5413 W. Henderson.  In fact, that was not true.  He
was living at the Gerber address, and has lived at multiple
addresses.  He also denied his drug use.

Throughout the course of this investigation, Special
Agent Korbs has found just to date that the defendant has used
at least nine different identities, or aliases, and I don't

mean those listed in his rap sheet, like variations of an Asian name. He, in particular used the name Adrian Aquino, a genuine California driver's license was found in his wallet when he was arrested in Seal Beach.

In connection with this particular case, Special Agent Korbs has found on his computer credit cards being applied for in this particular name, and other documentation showing him using this name in connection with the Gerber Road address.

He's also used the name Alene Seta on Western Union paperwork, the name Be Tran, Jim Tran, Roger Tran, Charles Henderson, Lisa Taki, Lisa Hertzog, and Tim Tran. And the way these names were used were a variety of ways. Some, particularly Be Tran was found on a counterfeit identification he had at his house. There was also a genuine California driver's license, which has been returned to him in the name Roger Tran that was found on his person when he was arrested in this case.

Most of the other names were used on Western Union accounts and applications to wire and receive money internationally.

Which leads me to the next point that I want to bring to the Court's attention. In addition to having contact with individuals nationwide, we found communications with individuals in Romania, Spain, Portugal and elsewhere

discussing the acquisition of credit cards and other information.

In one particular session that the agent found just very recently, in September 2006, the Romanian individual traveled to Montreal and had a detailed discussion with Mr. Nguyen about Mr. Nguyen making this Romanian individual a fake California identification so the individual could travel into the United States.

In addition, in Mr. Nguyen's residence, there were laminate and other information showing that he can make identification documents, and in fact, based on this communication, it wasn't a situation where the individual was in Romania, in fact, the individual traveled to Canada, and then communicated with Mr. Nguyen about getting this ID so he could enter into the United States.

The fraud in this case can only be described as extensive. I asked Special Agent Korbs to get me some examples for Court so that you could understand it, and the way Mr. Korbs has done the forensics on his computers, and there are multiple disc drives and computers, but some of the things he found, for example, he found 6400 credit card numbers, pins, CV2 numbers, which is the three digit number on the back of the card, bank and telephone number in one particular file.

There are over 300 files on Mr. Nguyen's computer, so many that Mr. Korbs has not been able to get through all of

them. There was one particular file involving Ebay identities. There's 357 pages of personal profile information. There are approximately three identities per page.

It also appeared that in carrying out this fraud, in addition to getting consumer information, Mr. Nguyen was involved in creating bogus websites, phishing scheme where you would either post or create websites, and people would access them, and enter their personal information, and often prompted by e-mails which were also found on his computer.

Vener Rentals (phonetic), a company in Colorado appears to have been a victim of this particular fraud. There were 100 profiles, name, address, telephone, e-mail, all sorts of customer identification.

There was another folder involving customer profiles. In that, there were 543 pages, approximately three identities per page. You had name, computer log-on, password, address, social security number, credit card number, credit card expiration date, the CV2 number, which I explained, pin numbers and the IP address suggesting intrusion, or hacking activity.

And additional file that Mr. Korbs found was 32 pages of profiles, approximately two per page, and it was quite extensive what information he had here. He had the date of log-on, the user name, password name, address, city, state, zip, telephone number, e-mail, date of birth, social security number, DMV number, state that the person resided, their

mother's maiden name, their credit card number, their expiration dates, their CV2 number, bank account information, including account owner, routing number and account number, which likely came from the phishing and intrusion activities.

He has 300 more files that he's attempting to get through to get the volume of this particular case. Just the way the guidelines work, at 500 per access device, the loss is well above two million, closer to five million, and that's when we just stopped counting, at about 10,000 access devices, and that doesn't even account for some of the actual loss where there has been spending, which is probably -- will raise that even more significantly.

What the government is also very concerned about in addition to the multiple identities, the access devices and whatnot, he had access to funds, much of which we're having difficulty tracing, but the evidence of he had an E-gold account, which as of August of 2006, he had $29,455 in it, despite statement that he was unemployed, or working for the family business and reported less than $10,000 of income.

He in addition had what are called Neo cards, which are somewhat anonymous cards you can sign up on-line that you can put debit amounts, and spend as you go. They're typically obtained internationally. He used widely moneygrams and Western Union. We can show pattern of transfers with others via those methods both in Romania, Spain, Portugal and

elsewhere.

In addition to these things I've indicated, we've seen deceptive conduct and concealment. Certainly what the Pretrial Services officer outlined, but also the defendant has frequently concealed the fact that he owns a BMW, in fact, it's in his uncle's name, but in his e-mail he indicates it's his car, and he has driven it for the last five years. AN din the Pretrial Services report it says it's a company car. So, the concealment of where he lives, and his property is certainly disturbing.

I don't have a lot of information on the properties that Mr. Cernyar says are at issue in this particular case, and I certainly would like an opportunity to respond to whatever he raises with respect to the possibility of those being used as security.

But based on the foregoing, particularly the drug use combined with the use of a firearm and the felony convictions, he should detained as a danger, and then the additional reasons I provided to you, he could be detained and should be detained as a flight risk.

THE COURT: Mr. Cernyar?

MR. CERNYAR: Good afternoon, Your Honor. Much of what I've just heard is news to me, but many of the names I've heard are family members. Roger Tran, for example is my client's stepbrother. I mean, that's my understanding, he's

his stepbrother.  That was the ID's they were talking about.

I received some documentation earlier today, or some discovery, and in that discovery some of the names I recognized and they were also part of the family.  So, I'm not certain where we're going here with this, but I think in regards to all this computer stuff, and all the allegations here, that one of the results, or one of the things we can do is, if this is a concern, is we could provide no access to Mr. Nguyen while he's released.

I think heightened supervision here would take care, I think, of a lot of the government's concerns in terms of danger, in terms of why Mr. Nguyen understood that he was a part of this.  He was investigated for some time in this particular case.  He did not opt to flee.  He stood his ground. He wants his day in court.

In terms of the gun, the shotgun that was found. There was a shotgun owned by his brother, Roger Tran, and I believe, my understanding is it's registered to his brother. It was not used.  It's never been used.  It was not loaded at the time.

In terms of surveillance, the home itself where Mr. Nguyen was arrested, and -- it was a home/commercial area where they sell granite, and one of the problems is that granite is stolen.  It's highly valuable.  It's stolen, and it's stolen quite frequently.  So a surveillance system was put in to stop

the theft.  It was not put in there for any other reason.  It's a family business.  Mr. Nguyen is not in charge.  He does not manage or operate that business.

In terms of the gun, Roger would stay there on occasion, more often than not, he lived there for quite a long time, and he felt safer with the gun because of the number of thefts that occurred at that property.

In terms of my client, he was there for -- my understanding is a day or two before the arrest.

In terms of the drugs, Your Honor, I think there may be some drug history here, and I think that could be addressed too, either through drug testing, or a transfer to a halfway house.  I think that's something that can be resolved.  My client's not opposed to either one.

As far as the prior criminal history, Your Honor, I -- it's my understanding that it's there, but it's also my understanding there has been no prior failures to appear.  So in terms of flight, again, I think something along home detention, and the bail amount.  My client's family is wiling, they're here today to discuss the bail amounts, and they're willing to put up several properties for the bail.

And the last time we were here, the Court requested some clarification of the property situation, about the mother, her ability, and the willingness.  The mother's notion to not remain here for the time being, or for the foreseeable future,

including trips to Vietnam and her health.  Her mother has told me, basically that she's willing to stay here and do whatever it takes if he's released.  She's willing to do that.

I think maybe there is -- sometimes the mother doesn't speak very good English either.  We have an interpreter, we requested an interpreter here today in case the Court wants to inquire with the mother, also the aunt and the uncle, the owners of the properties are here today in court, in case the Court wants to inquire of them.

With regards to the titles of property, whether or not it can be posted, I've done these things many times now, Your Honor, several times anyway, property bonds, and I believe the property is unencumbered.  One particular property, my understanding, has a value of $1 million according to the appraisal, and there is no mortgage, no encumbrances on it.  So that's a property -- that's the property on Cherry Avenue in Long Beach.

We have several other properties on Gerber in Sacramento that look like somewhere around $312,000, the combined equity in those properties.  We have a property on Curry Avenue in Long Beach that has an equity of $497,000 and there's a property on 42nd Place in Los Angeles that has an equity of $400,000.  I think that would be sufficient there in terms of if the Court were to release him on bail.

THE COURT:  Pretrial Services seems particularly

concerned about danger to the community, which under changes in the law, the ex-felon in possession of a firearm count now is deemed to be a crime of violence that the Court can detain for danger to the community.

Pretrial Services is concerned about Mr. Nguyen's apparent inability to refrain from criminal activity.  His rap sheet indicates a fairly frequent pattern of arrests capped off by a state prison term in 1999 followed by his release, almost immediately followed by a parole violation, and a return to state prison to serve out the remainder of that term, and then additional arrests in 2005 and 2006, all having to do with access device fraud of one kind or another.

That concerns Pretrial Services, that he's got a well established track record of not being able to comply with the law, despite having gone to state prison, and then been returned -- having been returned to state prison.

They're also concerned in terms of a danger to the community with his drug use.  The risk of financial harm to the community, posed by his continuing pattern of conduct, and then the such indicators as the fact that even on such matters as driving, the conduct that it doesn't seem to be of any concern to him whether he's got a driver's license or not.

That he's viewed -- even though his license is expired, he's viewed in 2005 that he's seen driving all the way to the time of his arrest.  Along with what they, I think,

interpret as his somewhat guarded -- if one is being kind and deceptive, if one's being more critical, responses to their inquiries regarding a number of matters involving his day-to-day conduct and life, along with the shotgun.

What -- and my concern is that a $2 million bail would seem to me to probably, despite all the access fraud and ability to produce fake identification and the like, a $2 million secured bond would be a pretty good protection against flight risk, it would seem to me. That's an awfully high bond, especially to have fully secured. It would probably be one of the higher ones I've ever had secured if it got posted.

What about danger, though?

MR. CERNYAR: All right, Your Honor, first --

THE COURT: How --

MR. CERNYAR: First and foremost, and talking in recent weeks, it's my understanding that Mr. Nguyen now has his driver's license back, and that was obtained I believe in early April. So that he's cleaned that up.

In regards to the gun, the gun again was a weapon that the stepbrother had purchased, and it's under his name, and he had used it in the business in Sacramento because of the theft. There was a lot of theft, stealing of granite. That was not something my client used, or ever intended to use, and obviously didn't use it when a bunch of people burst into the home on that particular day. Didn't even consider bringing it

out to use.

I don't think that could be attributed to my client, and I think his behavior speaks for that, that it's something that he wasn't going to use, and it wasn't something that he wanted to use. It was just there because it was his brother's. It wasn't loaded. My understanding was that it had never been shot, or used. So, that's in terms of that.

In terms of the access devices, we have spoken to the family, and we have several options to where we can put Mr. Nguyen. One of the options was the residence on Cherry Avenue. The residence on Cherry Avenue is also a business, and there were seven computers in that business, and the family said they don't want him near a computer. No electronic devices whatsoever.

So their suggestion was to put him, on home confinement, possibly on Curry Avenue, because on Curry Avenue there were no access devices, and no devices he can get to.

THE COURT: Who lives there?

MR. CERNYAR: Who lives there? I believe -- I'm not certain if -- who lives on Curry?

(Pause - counsel conferring with defendant.)

MR. CERNYAR: Okay. It's Rooms for Rent. It's a home where they rent the rooms out. If that's not satisfactory to the Court, then we could find a -- we could put him back in Sacramento. There's no computers there anymore. I mean, the

government took all of them away, and there's also another house right next door that has -- it's very limited in terms of what it does have.  I believe it has a couch and a telephone, and that's basically it.  And he would need the telephone if he was on home detention anyway, that's my understanding.

And if you were to take away the computer and the computer access away from him, then that would resolve this problem.  That would resolve his instrument for these access devices.  It would resolve the instrument for everything that the government has accused him of doing.

MS. TAYLOR:  Your Honor --

THE COURT:  Are you done?

MR. CERNYAR:  No, I wasn't, but --

THE COURT:  Go ahead.

MS. TAYLOR:  Oh, I'm sorry.  I thought he was finished.

MR. CERNYAR:  Okay.  In terms of the, you know, the drug is some concern, the drug usage, and that was with, you know, I think we have options here too.  If we wanted to drug test him, or if we think it's safer to put him in a halfway house.  I mean, the halfway house -- I don't know what the access is to computers in a halfway house, but I don't --

THE COURT:  We have no access to a halfway house.

MR. CERNYAR:  Okay.

THE COURT:  Unfortunately.

MR. CERNYAR:  Okay.

THE COURT:  Largest urban district in the country not to have a halfway house going on six years, five years?

PRETRIAL SERVICES OFFICER:  We have a halfway house in Oakland.

THE COURT:  In Oakland.  Yeah, outside the district. I don't think I want to send Mr. Nguyen to Oakland.

MR. CERNYAR:  But, Your Honor, that would be the one request, where he's not opposed at all to being tested, and if you want to do that once, two, three times a week, that's fine.

THE COURT:  Who owns all the property that you want to post?

MR. CERNYAR:  Your Honor, it's my client's aunt and uncle.  The property in Sacramento, it's my understanding, is owned by Mai, who is right back in the back row, and the property in Long Beach and Los Angeles is owned by the Uncle Quy, which I believe is the gentleman in the yellow jacket.

THE COURT:  Okay.  Leaving out the names, just tell me the relationship.

MR. CERNYAR:  Okay.  It's a -- the aunt owns the property in Sacramento, and the uncle owns the property in Los Angeles and Long Beach.

THE COURT:  Okay.  So it's two people posting all the property, and their aunt --

MR. CERNYAR:  It's two people, correct.

THE COURT:  One aunt and one uncle?

MR. CERNYAR:  Yes, Your Honor.

THE COURT:  And if I go through it, they understand what it means to post the property, and the fact that they lose it all if he fails to appear?

MR. CERNYAR:  Your Honor, my understanding is that they do understand, but my Vietnamese is not very good, so I brought them to court today if the Court wanted to address them, we have an interpreter here for them if the Court would want to ask, but my understanding is that they do know.

THE COURT:  All right.  You wanted to -- are you done?

MR. CERNYAR:  Yes, I am.

THE COURT:  You wanted to add something, Ms. Taylor?

MS. TAYLOR:  You know, Your Honor, I've heard what's said.  There was ammunition in the room right next to the firearm in boxes.  He's charged with being a felon in possession of a firearm and ammunition.  So, he has a complex surveillance system at a residence where he says he's only staying a short time, with a firearm and ammunition.

He changed his driver's license to Chico a few days before.  So on DMV when you look it up, it said Gerber, but on the day he's arrested, it shows up on the computer as Chico.  So this guy is someone who can't lead this Court to believe that the firearm was there, because his brother, who lives in

Vietnam, doesn't even live in the United States, saying somehow it's his brother's.

He told Pretrial Services that he was either living with the brother, or he made statements about his brother that turned out to be false in the past, and maybe Mr. Sheehan can elaborate on that. But it doesn't fly. I mean, it wasn't the brother's firearm. It was in his room, where he was staying, with his stuff, with his fraud, with the ammo, with the gun.

In addition, you can take his computers away. I don't want Mr. Cernyar to miss my point. I think he will engage in fraud again if he's out. But that's not the point. The point is, he has access to -- almost immediate access to financial information and bail in this particular case isn't going to change the fact that he's using drugs, that he has a gun, that he has ammo. It's different than a financial fraud case.

So I don't want you just to think I'm sitting here saying, oh, we're really concerned he's going to go out and do some more fishing. It is not that. This is a man who has resources to do whatever he wants. Whether it is to leave, to go to Vietnam, to go to Romania, to go to Chico, to go to Canada to buy more firearms, to engage in more fraud, the damage to the community with his drug use and firearm, he is someone that is in just a delicate state that is truly dangerous.

These properties, I've heard none of them, with the exception of maybe Cherry, or places where his family members are living, they appear to be commercial style properties either where no one is living, or business is being done. It's not something that seems particularly likely to really commend someone who's using drugs and has firearms that there is an amazing consequence to what he's doing.

I'll give you that it's a huge amount of bond. It's a large bond. But it kind of misses the point. I can't get past the fact of the danger.

MR. CERNYAR: Your Honor, if I may address the Court in regards to Roger Tran, his stepbrother. He was born in Santa Ana. He does not live in Vietnam. He lives here. In fact, when my client was arrested, he had his brother's, stepbrother's driver's license was in the house, and I believe it was in his pocket, and the address is Gerber in Sacramento. It's the Gerber address in Sacramento is where the brother lives. That's where he lives. He is not in Vietnam. I don't know where this Vietnam thing came from in regards to his brother.

And in regard to the DMV license for Chico, I'm not certain of that, and I am not certain how my client who had a suspended license at that time could even walk into the DMV and request a license for -- and they give him one, for an address in Chico. I don't know how that works.

THE COURT:  My guess is that Agent Korbs would say that that's not how he got it, but maybe I'm wrong in that regard.

MS. TAYLOR:  This is his genuine CDL.  He does have one in his own name.  I have copies of it if the Court wants to see it, and I asked Mr. Korbs to run me a report on it this morning.  And he goes, that's really interesting, he was arrested, but as of January 26th, it's showing the Chico address, but a few days earlier it was Gerber.

He must have done it, you know, in just the lag time on the computer, or -- but he couldn't explain it.  And the defendant said, well, he was going to move up to a rental property in Chico.

It says in the Pretrial Services report that Roger Tran lives in Vietnam, and that that was according to Mr. Nguyen's mother.  So either she was just mistaken, or he came back, but it's kind of a moving -- there's lots of facts in this case that are just moving targets, who owns what, what property is where, which ID he's using, which name he's using.

I can show the Court and Mr. Cernyar the DMV information if you want it.

MR. CERNYAR:  Your Honor, another mention is that in each one of these times that my client has been arrested, he never gave a false name.  He has given his truthful name.  He gave his truthful name to the investigators or arresting agency

in this particular case.  He's never tried to hide anything.

MS. TAYLOR:  Well, that's not true.  He's tried to hide a lot of things, but --

MR. CERNYAR:  But not his name.

THE COURT:  Submitted?

MR. CERNYAR:  Submitted, Your Honor.

THE COURT:  Government?  Submitted?

MS. TAYLOR:  Submitted, Your Honor.

THE COURT:  This case is difficult to assess, and my observation is that it's difficult to assess primarily because of Mr. Nguyen's own conduct.  He's managed to obfuscate things to such a degree that it's hard even for an attorney who works very hard at it to straighten it out, make sense of it all, and present it in a compelling way.

Although, Mr. Cernyar has done a very good job at trying to simplify it, and trying to present it in a way that does make sense.  But the truth of the matter is, there's just a lot of loose ends.  One can ascribe it to communication difficulties, and perhaps in part, but much of it is because of Mr. Nguyen's own conduct that he finds himself in this situation where it's very difficult to explain what it is he has or hasn't been doing.

When you have as many different identifications and as many -- as unsettled of an identity in terms of where he's living, and who with, and the like, it becomes very difficult

to present it in a way that makes him appear to be stable enough to release on bail.

Based upon what I have in front of me right now, I find that by a preponderance of the evidence that none of the currently proffered conditions, or combination of conditions would reasonably assure his appearance.

And I also find by clear and convincing evidence at this time, that no condition, or combination of conditions that have currently been proffered would reasonably assure the safety of the community, were he to be released.

And therefore, I'm going to order that the defendant be detained pending further proceedings. That order remains without prejudice, and -- because here's what I would do, though I'm -- you know, obviously you've -- given the government's position, that might be challenged if I did do that, before Judge England.

If I had $2 million worth of posted property, if I had -- by people that understood what it meant to post it, I would find that to adequately address flight risk. And despite all of the concerns regarding all the false identification and the like, if I had a stable residence, with a third party custodian that I could trust, with Pretrial Services supervision and electronic monitoring, with a no access to any devices, and no contact with individuals outside the United States, or whatever, I mean, whatever the conditions that we

put on it, I would find that home detention, electronic

monitoring in a residence with a third party custodian present

with all the conditions and supervised release supervision, I

would think that that would pretty much address danger to the

community because I don't know under those conditions how he

would obtain drugs, or get away with obtaining drugs, how he

would obtain firearms, or get away with obtaining firearms, or

how he would engage in access device, or other computer fraud,

and get away with it.

        And I would think that that combination of conditions

would, in fact, in combination with the posting of a very high

bond, address both flight risk and danger as far as I'm

concerned.  Like I said, that may or may not pass somebody

else's test.

        Now, the problem that I have with what I've got right

now, is I don't think I've got that.  I don't know where we'd

be sending him.  I'm not sending -- I wouldn't be at all

convinced the danger to the community would be addressed by

sending the defendant to a halfway house in Oakland.  In fact,

I think in many respects, that might increase the potential

danger to the community.  So that doesn't work.

        And sending him to a rental property with a bunk bed,

or a cot and nothing else, where he's home alone, that doesn't

do it for me.  I need even more of a plan before I'd be

convinced.  And obviously, given the government's stated

position, they might very well challenge even that order.

But based upon what I've heard so far, that's what I think would suffice, and I don't think I have that.

Now, I don't know if you're going to try to take another run at this, Mr. Cernyar. If you are, maybe while the proposed posters of property are present, and we have an interpreter, maybe it wouldn't be a bad idea for me to make inquiry on the record.

MR. CERNYAR: I would appreciate that, Your Honor. Thank you.

THE COURT: And the folks names are?

MR. CERNYAR: Is Mai.

THE COURT: Could the interpreter state her appearance on the record?

THE INTERPRETER: Good afternoon, Your Honor. Minh Tam Ha, certified Vietnamese interpreter, previously sworn.

THE COURT: Thank you, ma'am. And who's the other individual?

MR. CERNYAR: Quy is the uncle, Your Honor, and I'm not sure what their last name is.

THE COURT: Can you ask both of the individuals to state their full names for me please?

THE INTERPRETER (for aunt): My name is Nguyen Mai Le. I am his aunt.

THE COURT: All right. The defendant's aunt. And

the gentleman?

        MR. TRUONG:  My name is Quy Ngoc Truong.

        THE COURT:  And your relationship to Mr. Nguyen is?

        MR. TRUONG:  The relationship is I'm his uncle.

        THE COURT:  All right.  Now, Mr. Nguyen's attorney, Mr. Cernyar has indicated to the Court that both of you separately own property that you would be willing to post with the Court as security for Mr. Nguyen's release.

        THE INTERPRETER (for aunt):  Yes, I do.

        MR. TRUONG:  Yes, I do.

        THE COURT:  And my understanding is that the combined equity in those properties may be approximately $2 million. The combined equities.

        THE INTERPRETER (for aunt):  Yes, the combination of all the properties.

        THE COURT:  All right.  And is that your understanding as well, sir?

        THE INTERPRETER (for uncle):  Yes.

        THE COURT:  Now, that would -- if we ever got to the point where the posting the bond was agreed upon by the Court and ordered, there would have to be appraisals and the like to prove the exact equities.

        MR. CERNYAR:  Your Honor, we do have appraisals.

        THE COURT:  I don't need them.

        MR. CERNYAR:  Okay.

THE COURT:  Because we're not there.

MR. CERNYAR:  Okay.

THE COURT:  But my question is this, to the two of you, if bond was someday set for Mr. Nguyen, and you posted your properties to secure that bond, if he failed to appear at a future court proceeding after his release, it would mean that the government could take those properties that you had posted, and that you would lose them.

MS. LE:  Yeah, I do, but I love him, you know, he can't just sit in jail.

THE COURT:  All right.  My question is this, do you understand --

MS. LE:  I understand.

THE COURT:  -- that if you posted your properties and he failed to appear, that you would lose them to the government?

MS. LE:  Yes, I understand what the Court is saying.

THE COURT:  And sir?

MR. TRUONG:  Yes, I understand.

THE COURT:  And are you indicating that you're willing to do that?

MS. LE:  Yeah, I will.

MR. TRUONG:  I do.

THE INTERPRETER:  I do.

THE COURT:  All right.  I don't have any more

questions at this time.  I am not setting bond at this time because --

        MS. LE:  Thank you so much.

        THE COURT:  -- because I've indicated that I don't find adequate conditions being proposed at this time.  But I have conducted voir dire of the two individuals who apparently would post property to secure the defendant's release, and I'm satisfied that they understand the consequences of doing that if, at some point, adequate conditions can be proposed addressing concerns regarding danger to the community.

        The defendant's ordered detained.  We've set a date before Judge England.  Is there anything further?

        MS. TAYLOR:  No.  Thank you for your time, Your Honor.

        MR. CERNYAR:  Nothing, Your Honor.  Thank you.

        THE COURT:  Thank you.

    (Whereupon the hearing in the above-entitled matter was adjourned at 3:31 p.m.)

                        --o0o--

                       CERTIFICATE

    I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


_____     June 15, 2007
Patricia A. Petrilla, Transcriber
AAERT CERT*D-113