UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

--o0o--

| | |
|---|---|
| UNITED STATES OF AMERICA,     ) | Case No. 2:07-cr-00164-MCE |
| ) | formerly 2:07-mj-00102-DAD |
| Plaintiff,    ) | |
| ) | Sacramento, California |
| vs.     ) | Tuesday, June 12, 2007 |
| ) | 2:52 P.M. |
| TIEN TRUONG NGUYEN,     ) | |
| ) | Hearing re: defendant's |
| Defendant.    ) | request for reconsideration |
| _____) | of detention. |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE DALE A. DROZD
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For Plaintiff:                ROBIN R. TAYLOR
                              U.S. Attorney's Office
                              501 I Street, Suite 10-100
                              Sacramento, CA   95814
                              (916) 554-2900

For Defendant:                MICHAEL K. CERNYAR
                              Law Office, Michael K. Cernyar
                              400 Oceangate, 8th Floor
                              Long Beach, CA   90802
                              (562) 216-2940

Court Recorder:               CASEY SCHULTZ
                              U.S. District Court
                              501 I Street, Suite 4-200
                              Sacramento, CA   95814
                              (916) 930-4193

Transcription Service:        Petrilla Reporting &
                                Transcription
                              5002 - 61st Street
                              Sacramento, CA   95820
                              (916) 455-3887

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

SACRAMENTO, CALIFORNIA, TUESDAY, JUNE 12, 2007, 2:52 P.M.

THE CLERK:  Calling Criminal Case 07-0164-MCE, United States v. Tien Truong Nguyen.  Your Honor, this matter is on calendar for defendant's request for reconsideration of detention.

THE COURT:  Who's here for Mr. Sheehan today?

(Pause - Court conferring with Pretrial Services officer.)

THE COURT:  All right.  The matter is on for a motion to reconsider detention.  I've heard this matter a few different times, and it's now back before me on the defendant's motion, and what is it that you think has changed, Mr. Cernyar?

MR. CERNYAR:  Good afternoon, Your Honor.

THE COURT:  I'm sorry.  I didn't let anybody announce their appearances  Go ahead.

MS. TAYLOR:  Good afternoon, Your Honor.  Robin Taylor on behalf of the United States.

MR. CERNYAR:  Good afternoon, Your Honor.  Michael Cernyar on behalf of Mr. Nguyen, who is present and in custody.

Your Honor, I think where we last left off was the Court was looking for something -- some condition of release which would protect the community.  And I think what we had discussed, certain items of no access to computers, but I think what the Court wanted was if my client were -- was to be released, a responsible, reliable person that if he is under

house arrest, would be -- if he was placed under house arrest, it would be also a responsible, reliable person there with him.

And what's changed, Your Honor, is we -- submitting to you Mr. Ashok, and I'm going to butcher this last name, Your Honor, but Bikkannavar, who is willing to act as a third party. Mr. Bikkannavar, my understanding, has known my client for around 15, 16 years. He's been a friend of the family for about 15, 16 years, and he is dating my client's mother, and they live together at 1917 Curry Avenue in Long Beach.

I should also mention to the Court that Mr. Bikkannavar is in court today. So he is here. And if the Court wishes a voir dire, or anything of that nature.

With that, too, Your Honor, I noticed the Pretrial Services has done a re-evaluation based on what we have submitted, and has made some recommendations, which we're willing to adopt.

THE COURT: That might be a little strong. I don't read it as a recommendation. I --

MR. CERNYAR: Oh, no. No. It's -- but they said that if he was released, they'd have some recommendations --

THE COURT: Right.

MR. CERNYAR: -- which we would be willing to adopt. And not say that Pretrial Services is making a recommendation.

THE COURT: All right.

MR. CERNYAR: And Your Honor, I think that's what's

changed in this particular case.

THE COURT: All right. Ms. Taylor, I note that the government has a reasonable disagreement with my position as I've expressed it in the past, because I have certainly considered the notion of releasing Mr. Nguyen on conditions, which I would say that the conditions that I've talked about in the past, or considered, is possibly satisfactory involve -- I think the highest bail amount I would have every set in about 10 years on the bench, and probably the most strenuous and restrictive of conditions of release that -- at least equal to the most strenuous and buttoned down conditions of release that I have ever considered.

And so, I have been -- I have considered that in the past as being satisfactory, but I know that you have a reasonable position that you've expressed in the past that this tries to dissuade me of thinking along those lines.

Do you want to take another -- one more crack at it?

MS. TAYLOR: You know, I sat through the hearings, and I heard the Court articulate sort of a road map for where this case might be going, and I went back and thought about the case, and some of these points I've discussed previously, but I just want to emphasize and remind the Court again.

This case was brought to the Court as both a danger and a flight risk. And even the most buttoned down of conditions, and the highest bail amount in this case is

simply -- may simply be not enough to help this defendant stay on track.

And what concerns the government is obviously, we talked about the shotgun and the surveillance system, and that's what brought it to you as a danger. But the defendant, and I don't think anyone would disagree with this, is addicted to methamphetamine. He has been found with the drug, he is using, prior to going into custody on a daily basis.

He has a criminal history for drugs. He has violated the law numerous times, and I believe there are probation violations as well.

And the government also indicates that he lied straight out to Pretrial Services. I can understand why he might lie about his drug use, because that in some ways sort of makes sense. But he told Mr. Sheehan that he was living in an address that he wasn't living at, which the government believes goes both -- probably more to the issue of flight. But he's unreliable.

And the government has found out a few things since we met last time. It does look like other family members may be involved in this particular fraud. I don't think -- we don't have any evidence that his mother, or the third party custodian is at this point. But his brother Roger Tran is very significantly active in the e-mail chat with this particular defendant.

And I don't want to oversell this, but there are discussions that the fraud proceeds were used to make mortgage payments on the Sacramento property, the Gerber property.

I did take it upon myself to contact the Office of International Affairs to find out exactly what the relationship was with Vietnam in terms of extradition and those sorts of things.  And currently, we have no treaty with Vietnam, and because he isn't a citizen here, he'd be considered a Vietnamese national.

And while they didn't say it's possible, they sort of did, they said it's not happened yet, and they didn't anticipate if he were to go to Vietnam that we would be able to find him, or put into play any sort of extradition process.

And what the government thinks the Court should find is persuasive is the mother has indicated in this case her desire to return to Vietnam.  She said she might stay here. Her son is looking at -- I mean, the loss in this case is conservatively -- if you look at the volume of credit card data, he could be looking at more than 12 years in custody.

Certainly to the extent they have any savings, or any money, going back to Vietnam is certainly an option, and it leaves the government completely unable to locate, or to bring Mr. Nguyen back.  And if he wasn't aware of it before, he's certainly aware of it now that I've said it.

I think conditions in this case are really kind of

illusory.  You can commit this fraud anywhere.  He could have a wireless card in his computer.  He obviously is very savvy. He's been able to duplicate websites and carry out fraud with nationwide implications from his bedroom.  And so, the no access to computers is going to be difficult to enforce unless he is visibly watched at every moment.

The custodian, I think the Court at a minimum would have to query the custodian.  It doesn't appear to the government that his family is aware of a lot of his prior misconduct, both his prior offenses, the scope of the fraud he was involved in, the type of conduct he was conducting, both in Los Angeles area and at his house.

And as I walked through, I made just a comprehensive list of all of the factors.  And I know I said them to you before, and so I don't just want to sit and parrot back to you things that you have heard, but while you've said that the bail in this case is the largest you've seen, one, it's a slight bit illusory.  There's two million, but a little more than $800,000 worth of the properties have encumbrances.  So the government would be in a second position, which the Court -- I mean, it just isn't a very favorable position for the government.  It's not going to be able to do anything with those properties.

And two, most of the property doesn't seem to be that type of property that is going to really guarantee that the defendant appear in court.  It's not the roof over his family's

head, the Gerber property and some of the others are more rural business locations.

So I -- as I articulated before, while the Court says the bond is the largest it's set and the conditions are the most buttoned down, in Court here is someone with the Secret Service for 23 years, he's never seen a fraud of this scope in his work with the service, this number of victims, this volume, this level of sophistication, and he's worked a lot of cases.

So that's why I stand before you making this type of argument, because the government believes both on the danger and on the flight that he should be detained.

And if the Court has any questions, or wants me to follow up on the other arguments I've made, certainly I can do so.

THE COURT:  What's -- remind me -- I was looking for it.  Remind me again what his immigration status is?

MS. TAYLOR:  My understanding is that he is a permanent resident.

THE COURT:  All right.

MS. TAYLOR:  He is here legally, but not a citizen.

MR. CERNYAR:  Your Honor, he was on one of the boats that left, and I believe he's there about 18 months.  He was in one of the boats that left Vietnam and was out to sea for about four months.  He's not a citizen of the United States, nor does he have a passport from the United States, or from Vietnam.

And so --

THE COURT:  Although that -- well, never mind.

Remind me again of the $2 million bond secured by property that's being proffered.

MR. CERNYAR:  Your Honor --

THE COURT:  We're talking about residences -- the two residences at Gerber in Sacramento.  Who owns those and who's living there?

MR. CERNYAR:  Your Honor, I believe that's the aunt and uncle that were here at the last hearing when you did the voir dire.

THE COURT:  Right.  They own those?

MR. CERNYAR:  They own those.

THE COURT:  Who's living there now?

MR. CERNYAR:  What's that?

THE COURT:  Who's living there now?

MR. CERNYAR:  I'm not certain that anyone is living there, Your Honor.  It's a property that also is a commercial business.

THE COURT:  How about --

MR. CERNYAR:  Oh, there might be a possibility that Roger Tran is living there.  The mother is in the audience if the Court would like to --

THE COURT:  What about 1917 Curry?

MR. CERNYAR:  1917 Curry, Your Honor --

THE COURT:  In Long Beach.

MR. CERNYAR:  -- is a home that has an appraised value of $710,000 and the balance is around 210,000.  And I believe that is the aunt -- that -- I believe the aunt owns that particular home, Your Honor.  And that's a -- and my understanding, Your Honor, it's a 4,000 square foot home.

THE COURT:  A rental?

MR. CERNYAR:  No.  No, Your Honor.

THE COURT:  She lives in that house?

MR. CERNYAR:  Actually, I believe her sister, who's in the audience, or in the -- not the audience, but the --

THE COURT:  How about getting it together and let me know -- tell me whose they are and who lives there on each of the properties that you're -- go talk to the folks you need to talk to --

MR. CERNYAR:  Okay.

THE COURT:  -- and tell me what are the properties, who owns them, who lives there.

MS. TAYLOR:  I also understand some of them are in trust, so I don't know how much that matters, but it would be helpful to at least hear the --

THE COURT:  Then they're going to have trouble posting them.

MS. TAYLOR:  I -- that came to my attention this morning.

MR. CERNYAR:  Your Honor, they're in trust from Placer County and they're going to be reconveyed back.  There' another case in Placer County in which --

THE COURT:  You think they were posted up there?

MR. CERNYAR:  Yes, they were.

MS. TAYLOR:  Oh, then that probably won't be as complicated.

(Pause counsel conferring.)

MR. CERNYAR:  All right, Your Honor.

THE COURT:  Can you go through the list of properties, who owns them and who currently resides in them?

MR. CERNYAR:  All right, Your Honor.  The property at 8285 Gerber in Sacramento is owned by Mai, and there is -- my understanding there's no one that lives there, Your Honor.

The property at 8289 Gerber in Sacramento is owned by Quy, the uncle, and again, occasionally Roger Tran lives there, but other than that, no one else is there.

Your Honor, the one at 1917 Curry in Long Beach is owned by Mai, and the defendant's mother and Mr. Ashok Bikkannavar live there.

THE COURT:  And that's the home that you're proposing that the defendant be --

MR. CERNYAR:  Released to.

THE COURT:  -- released under home detention and electronically monitored --

1    MR. CERNYAR:  That's correct, Your Honor.

2    THE COURT:  -- at that address?

3    MR. CERNYAR:  Yes, Your Honor.  And the property at

4 6145 Cherry, Your Honor, is owned by Quy, the uncle.  There's

5 an aunt that lives there, I believe the spelling of her first

6 name is A-l-o-c.  Le is the last name, L-e, Your Honor.  And

7 Your Honor, my understanding, that house has an appraised value

8 of a million dollars, and there is no balance on that home,

9 it's owned outright.

10    And then the property at 1608 West 42nd Place in Los

11 Angeles is a rental property, Your Honor.

12    THE COURT:  Owned by?

13    MR. CERNYAR:  Owned by, I believe the uncle.

14    THE COURT:  Mr. Bikkannavar?  It's being proposed

15 that I name you as a third party custodian for Mr. Nguyen.  If

16 I were to do that, he would be residing at the same home that

17 you're residing at, correct?

18    MR. BIKKANNAVAR:  Yes, sir.

19    THE COURT:  And you would be with him?

20    MR. BIKKANNAVAR:  Yes, sir.

21    THE COURT:  Are you there during the day?

22    MR. BIKKANNAVAR:  Yes, sir.

23    THE COURT:  Do you work during the day?

24    MR. BIKKANNAVAR:  Just one or two hours.  I just

25 teach tennis, that's it.

1    THE COURT:  All right.  So you're at home much of the

2  day?

3    MR. BIKKANNAVAR:  Much of the day.

4    THE COURT:  And have you ever been convicted of a

5  criminal offense of any kind, sir?

6    MR. BIKKANNAVAR:  No, sir.

7    THE COURT:  And you say you've known the defendant

8  for how long?

9    MR. BIKKANNAVAR:  I know his mother and through her

10  mother I know him the past several years.

11    THE COURT:  About how many, approximately?

12    MR. BIKKANNAVAR:  About 10, 10 to 12 years.

13    THE COURT:  Ten to 12.  If I appointed you as his

14  third party custodian, I would be imposing a number of very

15  restrictive conditions upon Mr. Nguyen's release, and I would

16  list them all, but he would be very severely limited.

17    He would have a curfew, he would have electronic

18  monitoring, he could not use any alcohol, or drugs of any kind,

19  he would have to seek treatment as directed by the Pretrial

20  Services office.  He basically, except to go to court, couldn't

21  leave the house between certain hours.  A number of different

22  conditions.

23    And as a third party custodian, if you became aware

24  that he had violated, or was violating any of those conditions,

25  it would be your responsibility to contact a Pretrial Services

officer and report that conduct immediately.  Do you understand that?

   MR. BIKKANNAVAR:  Yes, sir.

   THE COURT:  Now, it's been represented to me that -- well, you've known him 10 or 12 years and you are in a relationship with his mother.  Even if his mother says to you, oh, look, he won't do it again, don't report him, it's still going to be your obligation to call up Pretrial Services and say, hey, he had a drink, I know he's not supposed to have a drink.  You'd be able to do that?

   MR. BIKKANNAVAR:  Yes, I can.

   THE COURT:  Even though his mother is going to be asking you not to?

   MR. BIKKANNAVAR:  Yes sir.

   THE COURT:  All right.  Thanks.

   Let me make one thing clear.  This is -- I mean, I have -- one reason I haven't asked anything further from the -- agent, I mean, I've read this indictment before, and you don't have to convince me that it's a very serious computer fraud, access device fraud case, and that Mr. Nguyen is a very sophisticated individual when it comes to these kind of offenses.  The indictment speaks for itself in that regard.

   His prior record is troubling, and obviously, very poor.  It's clear, as the government has argued, that he, at least prior to his incarceration, was a regular, if not every

day user of methamphetamine. That, who knows which comes first, the chicken or the egg in that regard. But it may be that his conduct was in part fueled by that use of unlawful narcotics.

I have no illusions as to Mr. Nguyen's past, or about the charges of the indictment. The question that I've always looked at in a case is, all right, given the fact that one can certainly make a compelling case that Mr. Nguyen has engaged in serious criminal conduct over a significant period of time, nonetheless, I still come back to the question of, all right, I'll give you that. I have no quarrel with it.

But if folks related to him are putting up $2 million, and as it turns out, some of them are the roofs over family members heads, at least that's what's being represented, that to me is a significant factor in terms of determining flight risk. That do I -- am I reasonably assured that if a $2 million secured property bond is posted, am I reasonably assured that he will not flee, particularly if I've got him on electronic monitoring, and home confinement, and the rest.

And I have to say, as serious as the charges are, and as poor as his prior record, and as crooked as he's been, apparently as a result of looking at that prior record, yeah, I think I'm reasonably assured that a $2 million secured property bond with the other conditions gives me reasonable assurance that he won't flee.

Reasonable people could disagree about that. I feel reasonably assured. That's a lot of money. And even if the government's in second it's still a lot of money, and at least a million dollars of it, it sounds like, is free and clear, and so the first million comes off the top. It's a lot of money. It's the highest bond I've ever even though about setting.

So then that gets me to danger, and that's always the more problematic one, because the posting of the security, unless you make it a Vacarro bond, which I'm disinclined to do, the posting of security doesn't really directly affect danger to the community.

And I've had this conversation with various Pretrial Services officers too, and that's why I say, reasonable people can disagree. In this case, I know pretrial does disagree to some extent with the way I'm looking at this.

But given these offenses, the computer fraud, the access device fraud, the aggravated identity theft, even the gun charge, which I don't think that there's a history of violence in the defendant's background. He did have this firearm. I think most of the prior offenses are all fraud related, and burglary related. They're all property crimes, I think. I'm pretty sure of that. Although it's a long laundry list. That gentleman's racked up quite an impressive record of fraud and the like.

I look at the condition, and I say, if I've got him

under third party custody, if I've got him under electronically monitored home confinement, if I've got him basically under house arrest, except for purposes of treatment for any remaining narcotics addiction, or substance abuse problem, along with any mental health, and the like.

If I've got him basically wrapped up at home with no access to electronic devices, and a third party custodian that says, look, I'm there most of the time, and I'm telling you, Judge, if he violates a condition, I will in fact call, because I hope he -- the third party custodian would realize this, because if I don't, and something goes haywire, and this kid flees, we're going to lose the house we live in, so I better not take any chances. If he violates, I better call Pretrial Services before it gets any worse. Otherwise, we're all going to lose $2 million worth of property.

Then I look at that, and again, I say to myself, am I reasonably assured that he's not going to pose a danger under these conditions? And again, I recognize reasonable minds could disagree. Judge England could disagree. I know the government disagrees, and to some extent, pretrial even disagrees with me.

Bu I look at that and I say, yeah, I'm reasonably assured that he's not going to engage in this same criminal conduct that he's been on quite a roll of for a long time.

He's seen the inside of the Sacramento County Jail

for a fair length of time now.  I would think that he'd be

pretty heavily motivated not to put him in a situation to

jeopardize his release on these conditions.  I don't know, I

just -- I think that the conditions that are now in play, if

they can be satisfied, I just think have him wrapped up as

tight as somebody can be wrapped up, and I think give me

reasonably, reasonable assurances.  If he violates the

conditions, and especially if he flees, he's going to cost

relatives of his over $2 million in property loss.

MS. TAYLOR:  You know, the one thing I wanted to ask

the Court is if the Court would query the third party

custodian, because one thing that's really bothered the

government in this case is that none of the family members had

any knowledge of the criminal priors, the criminal activity in

which he was involved.

Which I'm not saying they should, but he obviously

went to great lengths to keep it from them.  So one could infer

from that either these people don't know, and they're really

not in a position to watch over the activity, because they've

just been unaware of it, and he's able to keep it from them,

because he's very good at what he does.

And it just seems in this case, if the Court's wrong,

I mean the conditions -- I've had a case with a million dollar

bond.  The Musami (phonetic) Cattle Ranch posted a million

dollars.  That was a 75-year-old Japanese national in an

environmental time, no criminal history, had a lot of equities, and that was a very big bond.

But in this particular case, it just doesn't seem proportionate, one, to the amount of loss in this particular case, and the access this particular defendant has to identities, and money, and currency.

And two, I -- it puts the custodian in a really untenable position where he's sort of now navigating between the mother, who obviously -- I don't know what her position on this all is, but he's sort of in the middle between the mother and the son, trying to watch over what's happening, when nobody -- when everybody's been in the dark as to what he's been up to.

THE COURT: Well, how many hundreds of thousands of dollars is the government's estimate of the total loss?

MS. TAYLOR: You know, the loss in this case, Your Honor, if you use the number of credit cards, is over $5 million, and I stopped at five million for purposes of bringing the case because --

THE COURT: The actual loss?

MS. TAYLOR: Well, you -- under the guidelines, you attribute $500 for every access device the defendant has in his possession. We do have actual loss as well, but I believe -- I actually did put it together, that I calculated the loss between $2.5 and $7 million.

THE COURT:  Actual loss?

MS. TAYLOR:  Well, it's the loss that these guidelines will assign to him.  I can't --

THE COURT:  But I don't care about that.  What did people lose?

MS. TAYLOR:  We -- the agent can probably give you some information on the access to cash that he has seen.

THE COURT:  I thought we were talking, at least in part, about gift cards and merchandise valued at more than 200,000.

MS. TAYLOR:  There is the Wal-Mart lines of credit, which were the 200,000, and it's probably closer to three, and then the agent has identified -- do you want to go ahead and -- the neo cards and the --

AGENT KORBS:  Yes, but I don't have dollar figures at this time.  I mean, I'm just still trying to assess how many financial institutions he targeted, and I just spoke with one I was dealing with last week, they estimate about $80,000.  It's a bank up in Bangor, Maine, and they're putting together all their documents.  I mean, it's -- I'm still in the assessment phase, trying to figure what all was going on, with such an extensive amount of activity.

MR. CERNYAR:  Your Honor, if I may interject?

THE COURT:  Um-hmm.

MR. CERNYAR:  My client had lived for a number of

years with his stepfather in Santa Ana, and has been able to hide his activities from his mother. I don't think that's going to be the case anymore. The family is very much aware of what this situation is. This is something that I think when the family retained me, their thought process is a great deal different today in realizing the amount of activity that he is being charged with, versus what they thought would happen in the very beginning.

I am quite convinced that the family is going to do a great deal, and keep an eye on Mr. Nguyen. Something that they haven't had done before, because their activities -- or their access to Mr. Nguyen was somewhat limited. That's no longer going to be the case. He's not going to be able to hide from them. And he knew, I suspect he knew before, he had to hide from them, or they would have found out.

THE COURT: Well, I know it's a huge case. If I issue a release order, or if I issue a -- or if I set a bail with conditions, number one, obviously, I wouldn't sign a release order unless it was fully secured, and any questions regarding the bona fides of the properties were satisfactorily addressed.

But does the government also want me to stay the order, or stay any posting pending review?

MS. TAYLOR: I would ask the Court to do that. Obviously, we need to look at the property and consider the

Court's ruling, and make a decision.

THE COURT:  Well, I --

MS. TAYLOR:  I would ask the Court to stay it so we could make a determination if we would appeal to Judge England.

THE COURT:  All right.  One modification is I'm not -- I know that one of the proposed conditions if I were to set bail, has to do with maintaining employment, and a curfew. I'm not going to do that.  I'm putting him under house arrest, essentially.  I don't want him out working.  That could be subject to revisiting if it turns out the order survives review, the bail is actually posted, he's out for a while, that can always be revisited as to whether it's appropriate to allow him to seek employment.

But at least at the outset, I'm basically putting him under house arrest -- electronically monitored house arrest, except for absences approved by Pretrial Services.

I'm going to set bail in the amount of $2 million to be secured by the properties that have been addressed here in court with the following special conditions of release:

That Mr. Nguyen report to and comply with the rules and regulations of the Pretrial Services agency.  That he shall report in person to the Pretrial Services agency on the first working day following his release from custody.

That he is released to the third party custody of Ashok Bikkannavar at the address listed in Long Beach,

California on a full-time basis.

That he is to reside with the third party custodian, and not move or absent himself from that residence at all without the prior approval of his Pretrial Services officer.

His travel is restricted to the Eastern District and Central Districts of California without the prior consent of his Pretrial Services officer.

He shall not possess a firearm, destructive device, or other dangerous weapon. Additionally, he shall provide written proof of divestment of any firearms currently under his control.

He shall refrain from any use of alcohol, or any use of a narcotic drug or other controlled substance without a prescription by a licensed medical practitioner, and he shall notify Pretrial Services immediately of any prescribed medications. Medicinal marijuana whether prescribed or not may not be used under any circumstances.

He shall submit to drug or alcohol testing as approved by his Pretrial Services officer. He shall seek and/or maintain employment and provide proof of -- excuse me, strike that condition.

He shall participate in a program of medical or psychiatric treatment, including treatment for drug or alcohol dependency as approved by his Pretrial Services officer.

He shall surrender any passport he may possess, or

any other travel document to the clerk of the U.S. District Court and obtain no new passport or other travel document during the pendency of this case.

He is to remain at the residence that's been identified in the Pretrial Services report at all times, unless the absence from that residence is approved by his Pretrial Services officer.

He shall, in accordance with this release order, have a home monitoring unit installed at that residence, a radio frequency transmitter device attached to his person, and shall comply with all instructions for the use and operation of that device as given to him by the Pretrial Services agency, and the employees of the monitoring company.

He shall be personally responsible for the costs of his participation in the electronic monitoring program, and shal pay the monthly fee as instructed by the Pretrial Services agency.

He shall not access the internet, and he shall provide proof of the disconnection or termination of any internet service as required by the Pretrial Services officer and he shall not use or possess a computer in his residence, or at any other location unless otherwise approved by the Pretrial Services officer, and not only shall he not use any computer, but any other type of device capable of connecting to the internet in any way.

I will not sign a release order until property is reviewed by the government and either approved, or the subject of hearing before the Court and approved that meets the amount of the bond that's been set, and I will stay the order, the order setting bail.

I don't know, is there a time period provided by statute by which you have to move for review?

MS. TAYLOR:  You know, I was going to try and get it. I looked briefly before.  I didn't see one.

THE COURT:  I was just going to --

MS. TAYLOR:  I think you can set it for two weeks.

THE COURT:  Is two weeks enough time?

MS. TAYLOR:  I think so.  I can contact -- I'm gone the last week of June for a conference, but I can contact Judge England's courtroom clerk after court and at least get it on calendar.

THE COURT:  I will stay the order setting bail for 15 days to permit the government to seek review of the order setting bail by Judge England if they choose to do so.  Unless extended, the stay will expire at the end of 15 days, and at that point, I would consider the posting of property, and if appropriate, the issuance of a release order on these conditions unless the stay is extended.

MS. TAYLOR:  Would the Court be amenable to doing it through July 3rd?  That's -- I'll be back, that's the

next -- that will be the second Tuesday that Judge England has

calendar.  If he's able to get the property together very

quickly, I'll work with you, and I'll try and move up the

matter --

THE COURT:  I'll stay until July 3rd, unless --

MS. TAYLOR:  I think it's going to take him --

THE COURT:  -- unless subsequently modified.

MS. TAYLOR:  Okay.

THE COURT:  If they get it together, and you've

decided that you're not going to seek review, or whatever --

MS. TAYLOR:  We'll come back, yes.

THE COURT:  -- then I would dissolve the stay.

MS. TAYLOR:  Exactly.

THE COURT:  It may take a while to get it all

together anyway.  That will be the order.  Anything else?

MR. CERNYAR:  Nothing further, Your Honor.

MS. TAYLOR:  Thank you.

THE COURT:  I will advise you, Mr. Nguyen, that

if -- just because I may or may not see you back in this court,

if that order is not overturned on review, and if the property

is posted to secure your release, any intentional failure to

appear on your part in this case, not only would cost your

family members who are posting $2.2 million worth of property,

not only would they lose all that property, and that you would

be responsible for their loss, but in addition to that, it

would subject you to prosecution for the felony offense of failure to appear under 18 USC Section 3146.

If that happened, and you were convicted of failing to appear, the failure to appear itself would be punishable by up to 10 years imprisonment, a fine of up to $250,000 or both. In addition, the penalty for failing to appear would have to be imposed consecutive to any sentence that you might receive on the already pending charges.

So, if you are released, and that's a big if, it is obviously critically important that you stay in touch with your attorney, Mr. Cernyar, that you cooperate fully with Pretrial Services, that you abide by every condition that I've set on your release, and that you make all your scheduled court appearances.  Do you understand?

THE DEFENDANT:  Yes, sir.  Yes, I understand.

THE COURT:  And will you abide by those conditions?

THE DEFENDANT:  Yes, I will.

THE COURT:  There is significant reason to doubt your ability to do so, based upon your prior record.  The only reason that I've considered setting bail in your case is because of the support of your family members that are willing to put up $2 million worth of their property to secure your release.  Your mother has been here consistently at every one of your appearances.  Obviously, she support you a great deal. You are very fortunate to have family members that would

continue to stand by you despite everything that you have done to them so far.

But I will tell you this, if you get out, there's one way you can make this worse, which is a little hard to believe, because you've made it pretty bad already -- one way, and that is violate any of the conditions of release that I've set.  If you violate a single condition of your release, you have no slack.  One violation, back to jail, period.

THE DEFENDANT:  I understand.  Thank you.

(Whereupon the hearing in the above-entitled matter was adjourned at 3:39 p.m.)

--o0o--

CERTIFICATE

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____          June 15, 2007

Patricia A. Petrilla, Transcriber

AAERT CERT*D-113