1   DWIGHT M. SAMUEL (CA SB# 054486)
    A Professional Corporation
2   117 J Street, Suite 202
    Sacramento, California 95814-2282
3   916-447-1193

4   Attorney for Defendant
    TIEN NGUYEN

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9          IN AND FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11  UNITED STATES OF AMERICA,    )    No. Cr-S-07-164 MCE
                                 )
12                               )
                    Plaintiff,   )    SENTENCING MEMORANDUM
13                               )    AND SUPPLEMENTAL OBJECTIONS
          v.                     )    **AMENDED**
14                               )
    TIEN NGUYEN,                 )
15                               )
                    Defendant.   )
16                               )
17  _____)

18                      REQUEST TO FILE LATE

19        Tien (Tim) Nguyen, through his counsel, files this sentencing memorandum and

20  supplemental objections in support of a sentence below the advisory guideline range. Counsel

21  had filed timely a sentencing memorandum but noted an error and wishes to correct the error.

22  This memo is filed one court date late and should be considered the sentencing memo and

23  objections finally made.  Defendant respectfully submits the following arguments, points and

24  authorities and requests this court impose a sentence "sufficient, but not greater than necessary"

25  to achieve the sentencing purposes of 18 U.S.C. § 3553(a).

26  ////

27  ///

28  //

                                     1

## I. STATEMENT OF THE CASE

Historically, defendant Nguyen was appointed new counsel after he plead guilty and after objections to the PSR had been filed by former defense counsel but before sentencing.

Nguyen's new counsel adopts the previously filed objections to the PSR and has raised new informal objections which have now been addressed.

## II. STATEMENT OF DEFENDANT'S BACKGROUND

Defendant is presently 33 years of age. He immigrated from Vietnam as a 3 year old child in 1980 with his mother. Defendant never knew his father. Although he is a legal permanent resident, he presently has an ICE hold on defendant. The crimes for which defendant stands convicted are certainly crimes of moral turpitude and damages exceed the minimum limits required to effect deportation. As stated in the PSR, defendant has been designated an aggravated felon allowing for deportation. There is no guarantee that an immigration court would not order defendant back to Vietnam. The court is requested to consider deportation as a part of it's analysis.  Historically, defendant has been here since the age of either three or six all depending on what fact you accept.

Throughout defendant's life he has used drugs which is the core reason for his fraudulent activities. At age 15 defendant started using methamphetamine and marijuana. By the age of 16 he was in trouble. Before defendant could complete his juvenile parole, defendant, at the age of 21, suffered four arrests in the year 1998 all of which were methamphetamine driven. The culminating conviction of 1998 was for possession for which he served 16 months in state prison. Upon release from state prison defendant successfully completed his parole term.

Defendant ultimately succumbed to his drug habit and started using meth again and in 2005 was arrested but not convicted. In this case, as reflected in the PSR, defendant was on-line looking for a drug hook up and paid for his drugs in fraudulent contact information to another who turned out to be a confidential informant (Ryan Price). Defendant was using meth daily at the time of his arrest.

Upon review of defendant's life it is easy to see that methamphetamine has been his

prime problem and has driven him to commit crimes of fraud to support his habit. To some degree it could be said defendant's methamphetamine addiction diminished his capacity to restrain himself from committing acts of fraud. Defendant indicates that he wishes to get drug rehabilitation while in prison.

Although defendant plead guilty on the day of trial, he has always admitted his guilt and responsibility. The value of loss has always been his concern.

Since incarceration on January 26, 2007 Mr. Nguyen has made extraordinary rehabilitative efforts as documented independently to probation, the court, and opposing counsel. Probation indicates that nothing exists for the court to consider an downward departure however defendant asserts his extraordinary rehabilitative efforts should be considered by this court.

A summary follows:

1. Parenting Education series classes, 200+hours

2. Alcohol and other Drugs recovery, 250 + hours

3. Breaking Barriers/Framework for Recovery, 250+ hours

4. Substance Abuse,250+ hours starting August 2007

5. Man Alive (Men Aligned Nationally Against Living in a Violent Environment) 250+ hours

6. Relapse Prevention, 300+ hours

7. Domestic Abuse Prevention 200+ hours

8. Self Help(intimate small group therapy), 200+ hours

9. Fathers Responsibility, 250+ hours

The United States Probation Office has recalculated the guideline range to 151-188 months total. Probation had previously recommended a total sentence of 444 months.

III. LAW AND ARGUMENT REGARDING VARIANCE

3

**A.      The White Collar Guidelines Should Not Be Headed and the Court Should Consider a Variance.**

The guideline range is based on an adjusted offense level of 30 and Criminal History Category V. This advisory range should **not** be heeded because it (1) is the product of a fraud guideline that is not based on empirical data or evidence that it serves the purposes of sentencing, for which it has been severely criticized; (2) would result in a sentence disparate from similarly situated defendants in other fraud cases; (3) is far greater than necessary to promote the goals of sentencing in this case and (4) is inconsistent with the rules set forth in the guidelines themselves.

Defendants have a right under the Due Process Clause to notice and the opportunity to challenge any information that may be used to deprive them of life, liberty or property at sentencing, including victim impact statements and information provided by victims 17-836 Federal Sentencing *See Burns v. United States*, 501 U.S. 129, 137-83 38 (1991); *Gardner v. Florida,* 430 U.S. 349, 351, 358 (1977); *United States v. Tucker*, 404 U.S. 443, 447 (1972); *Townsend v. Burke*, 334 U.S. 736, 741 (1948). regarding restitution.83 This right is protected through various provisions of Rule 32 and Rule 26.2, which require notice in the presentence report; the opportunity to investigate, object and present contrary evidence and argument to the Probation Officer; the opportunity to file a sentencing memorandum and argue orally to the court; the opportunity for a hearing; the right to obtain witness statements, to have witnesses placed under oath and to question witnesses at any such hearing; and the right to have the court resolve any disputed matter. *See* Rule 32(e)(2), (f), (g), (h), (I); FED. R. CRIM. P. 26.2(a)-(d), (f). These protections apply to information about victim impact and restitution. S*ee United States v. Rakes*, 510 F.3d 1280, 1285-86 & n.3 (10th Cir. 2007); *United States v. Endsley*, slip op., 2009 WL 385864 (D. Kan. Feb. 17, 2009); FED. R. CRIM. P. 32(d)(2)(B), (D); 18 U.S.C. § 3664(a), (b), (e).

The Commission recognizes that, because of the impact discrete factual determinations have on the guideline range, "[r]eliable fact-finding is essential to procedural due process and to

4

the accuracy and uniformity of sentencing." U.S.S.G. ch. 6, pt. A (intro. comment.) Yet Chapter

Six, like the Sentencing Reform Act and the rules of evidence, places no limit on the kinds of

information to be used in resolving sentencing disputes. The court may consider any information

that "has sufficient indicia of reliability to support its probable accuracy." § 6A1.3(a), p.s.; *see*

*also* 18 U.S.C. § 3661 (declaring "[n]o limitation" on the information about the defendant that

may be considered by the sentencing court); FED. R. EVID. 1101(d)(3) (rules of evidence

inapplicable to sentencing). Unreliable allegations may not be considered, however, and out-of-

court declarations by an unidentified informant may be considered only when there is good cause

for anonymity, and the declarations are sufficiently corroborated. § 6A1.3, p.s. cmt. (backg'd), ¶

2. The commentary to policy statement § 6A1.3 leaves to the court's discretion the degree of

formality necessary to resolve sentencing disputes. It recognizes that while "[w]ritten statements

of counsel or affidavits of witnesses" may often provide an adequate basis for sentencing

findings, "[a]n evidentiary hearing may sometimes be the only reliable way to resolve disputed

issues." § 6A1.3, p.s. cmt. (backg'd), ¶ 1.

The Commission suggests that the standard of proof for sentencing factors is a

preponderance of the evidence. § 6A1.3, p.s. cmt. (backg'd), ¶ 3. However, the courts are divided

over whether a higher standard may be used for guideline determinations, especially when a

particular fact-finding will have a significant impact on the sentence imposed. *See United States*

*v. Garth*, 540 F.3d 766, 773–74 & n.2 (8th Cir. 2008)

*U.S. v. Ameline*, 409 F.3d 1073, 1085 C.A.9 (Mont.),2005. " The government "bear[s] the

burden of proof for any fact that the sentencing court would find necessary to determine the base

offense level." *United States v. Howard, 894 F.2d 1085, 1090 (9th Cir.1990)*. As we explained in

*Howard,* "[s]ince the government is initially invoking the court's power to incarcerate a person, it

should bear the burden of proving the facts necessary to establish the base offense level." *Id.*

Here, by placing the burden on Ameline to disprove the factual statements made in the PSR, the

district court improperly shifted the burden of proof to Ameline and relieved the government of

its burden of proof to establish the base offense level."

1      The advisory guideline range in this case is far greater than necessary to satisfy the goal

2   of sentencing. The harsh sentencing recommendations of § 2B1.1 are not based on past practice

3   or empirical data and have been increasingly rejected by sentencing courts in high-loss fraud

4   cases. As the sample of cases highlighted below demonstrates, defendants in fraud cases

5   involving less than $100 million in loss typically receive less than 10 years imprisonment, even

6   when the Guidelines recommend a much higher sentence.

7      Mr. Nguyen's advisory guideline range is substantially longer than the sentencing range

8   he would have faced under the original guidelines adopted in 1987. Over the past twenty years,

9   the Sentencing Commission has dramatically increased the severity of sentences for fraud

10  offenders by raising the number of points imposed for the amount of loss *and* by approving a

11  five-fold expansion in the number of specific offense characteristics. Because the Commission

12  failed to rely on empirical data when making these changes – and thus failed to fulfill its

13  institutional role – sentencing courts have tremendous discretion to disagree, on policy grounds,

14  with § 2B1.1's sentencing recommendations. *See Spears v. United States*, 129 S. Ct. 840, 843

15  (2009) (explaining that when the Commission fails to fulfill its institutional role, a district court

16  can vary from the guidelines "based on *policy* disagreement with them, and not simply based on

17  an individualized determination that they yield an excessive sentence in a particular case").

18     When the Sentencing Commission adopted the original guidelines in 1987, it sought to

19  ensure that white collar offenders faced "short but definite period[s] of confinement." U.S.

20  Sentencing Commission, *Fifteen Years of Guidelines Sentencing: An Assessment of How Well*

21  *the Federal Criminal Justice System is Achieving the Goals of Sentencing* Reform, at 56 (Nov.

22  2004) [hereinafter *Fifteen Year Report*]. The Commission thus reduced the availability of

23  probation and adopted a fraud guideline that subjected a defendant to no more than 78 months in

24  prison. To justify the increase in the rate of confinement above pre-guidelines practice, the

25  Commission explained that "the definite prospect of prison, though the term is short, will act as a

26  significant deterrent to many of these crimes, particularly when compared with the status quo

27  where probation, not prison, is the norm." USSG, ch. 1, intro., pt. 4(d) (1987).

28     But, as noted above, the Commission has abandoned its original goal of ensuring "short

but definite" sentences, and has instead steadily increased the prison sentences for fraud. For example calculating Mr. Nguyen's guideline range under the 2000 Guidelines provides a stark illustration of the dramatic escalation in the punishment for fraud over the past nine years.

In 2000 the guideline range would be a total of 25, as follows, 2F1.1(a) base offense of 6, 2F1.1(b)(1) using the alleged $18,900,000 as loss there would be added 15 levels, using a device to manufacture cards would increase the level by 2 and sophistication would increase the level by 2 as well. The total of 25 would be reduced by two levels for acceptance for a total offense level of 23 as opposed to the current calculated level of 40.

The Commission has adopted this radical shift in sentencing policy without the support of any empirical data demonstrating the penological value of its substantial increases in sentence severity. *United States v. Aldelson*, 4441 F. Supp. 2d 506, 514 (S.D.N.Y. 2006) (citing Kate Stith & Jose A.Cabranes, *Fear of Judging: Sentencing Guidelines in the Federal Courts* 69 (1998)) ("[Be]cause of their arithmetic approach and also in an effort to appear 'objective,' [the Guidelines] tend to place great weight on putatively measurable quantities, such . . . [the] amount of financial loss in fraud cases, without, however, explaining why it is appropriate to accord such huge weight to such factors.") Because the Commission failed to cite empirical data – and thus failed to fulfill its institutional role – sentencing courts have tremendous discretion to disagree, on policy grounds, with § 2B1.1's recommendations. *See Spears v. United States*, 129 S. Ct. 840, 843 (2009) (explaining that when the Commission fails to fulfill its institutional role, a district court can vary from the guidelines "based on *policy* disagreement with them, and not simply based on an individualized determination that they yield an excessive sentence in a particular case"). And indeed, "since *Booker*, virtually every judge faced with a top-level corporate fraud defendant in a very large fraud has concluded that sentences called for by the Guidelines were too high. This near unanimity suggests that the judiciary sees a consistent disjunction between the sentences prescribed by the Guidelines and the fundamental requirement of Section 3553(a) that judges imposes sentences 'sufficient, but not greater than necessary' to comply with its objectives." Frank O. Bowman III, *Sentencing High-Loss Corporate Insider Frauds After Booker*, 20 Fed. Sent. R. 167, 169, 2008 WL 2201039,at *4 (Feb. 2008).

Exhibit A highlights a number of the fraud cases in which district court judges imposed sentences below the advisory guideline range. As reflected in exhibit A, courts have substantially varied from the guideline range based on: (1) policy disagreements with § 2B1.1's sentencing recommendations, (2) concerns about unwarranted disparities *vis-à-vis* the many courts who have declined to impose within-guidelines sentences in fraud cases, and/or (3) mitigating aspects of a particular defendant's history or the nature and circumstances of his/her offense. These factors will be discussed at greater length below, these very same factors weigh in favor of a statutory sentence below the advisory guideline range in Mr. Nguyen's case.

**B.      The Lengthy Sentences, under § 2b1.1, for High-loss Fraud Defendants Do Not Reflect Sound Policy.**

When the Sentencing Commission fails to fulfill "its characteristic institutional role" of developing a particular guideline, or its later amendments, based upon empirical data or national experience, the district court has the discretion to conclude that the resulting advisory range "yields a sentence 'greater than necessary' to achieve §3553(a)'s purposes, even in a mine-run case." *United States v. Kimbrough*, 128 S. Ct. 558, 575 (2007). Similarly, when the Commission acknowledges problems with a particular guideline but fails to make appropriate modifications to address those problems, a sentencing court has greater latitude to sentence outside the advisory range. *Id*.(Upholding below-guidelines sentence based on policy disagreement with crack/powder disparity where Commission itself had reported that the disparity produced disproportionately harsh sanctions).

As a result of this lack of empirical data to support the guidelines some courts feel, "the amount of loss is often a kind of accident and thus a relatively weak indicator of moral seriousness...or the need for deterrence. See *US v. Emmenegger*, 329 F. Supp. 2d 416

The Sentencing Commission has dramatically increased sentences for fraud over the past twenty years. These steady increases have been adopted without empirical support, without adequate consideration of the cumulative effect of overlapping enhancements, and despite

1   continuing research showing that longer prison sentences do not increase deterrence.

2   Accordingly, the resulting guideline ranges should be given minimal weight in this Court's §

3   3553(a) analysis.

4        The Commission has dramatically increased sentences for fraud despite consensus

5   in the social science community that increases in sentence severity have little, if any,

6   deterrent effect. In promulgating the original fraud guideline, the Sentencing Commission aimed

7   to reduce the availability of probation and ensure "short but definite periods of confinement for a

8   larger proportion of  white collar cases." *Fifteen Year Report* at 56. The Commission's approach

9   was consistent with research, available at the time, showing that the certainty, rather than the

10  length, of a sentence has the greatest deterrent effect. In one widely-regarded study from the pre-

11  guideline era, for example, researchers studied white collar offenders (presumably the most

12  rational of potential offenders) and found no difference in deterrence even between probation and

13  imprisonment. *See* David Weisburd et al., *Specific Deterrence in a Sample of Offenders*

14  *Convicted of White Collar Crimes*, 33 Criminology 587 (1995) ("There is generally no

15  significant association between perceptions of punishment levels and actual levels . . . implying

16  that increases in punishment levels do not routinely reduce crime through deterrence

17  mechanisms.")

18       In the twenty years since the Guidelines were first adopted, empirical research has

19  continued to show that while certainty has a deterrent effect, "increases in severity of

20  punishments do not yield significant (if any) marginal deterrent effects." Michael Tonry,

21  *Purposes and Functions of Sentencing*, 34 Crime & Just. 1, 28 (2006). "Three National Academy

22  of Science panels . . . reached that conclusion, as has every major survey of the evidence." *Id.*;

23  *see also* Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative*

24  *Justice and White Collar Crime*, 8 Cardozo J. Conflict Resol. 421, 447-48 (2007) ("[C]ertainty

25  of punishment is empirically known to be a far better deterrent than its severity."). Typical of the

26  findings on general deterrence are those of the Institute of Criminology at Cambridge University.

27  *See* Andrew von Hirsch, et al, *Criminal Deterrence and Sentence Severity: An Analysis of Recent*

28  *Research* (1999), summary available at http://members.lycos.co.uk/lawnet/SENTENCE.PDF.

1   The report, commissioned by the British Home Office, examined penalties in the United States as

2   well as several European countries. *Id*. at 1. It examined the effects of changes to both the

3   certainty and severity of punishment. *Id*. While significant correlations were found between the

4   certainty of punishment and crime rates, the "correlations between sentence severity and crime

5   rates . . . were not sufficient to achieve statistical significance." *Id.* at 2. The report concluded

6   that "the studies reviewed do not provide a basis for inferring that increasing the severity of

7   sentences is capable of enhancing deterrent effects." *Id*. at 1; *see also* Zvi D. Gabbay, *Exploring*

8   *the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8

9   Cardozo J. Conflict Resol. 421, 448-49 (2007) ("[T]here is no decisive evidence to support the

10   conclusion that harsh sentences actually have a general and specific deterrent effect on potential

11   white-collar offenders.")

12       In short, the Commission has dramatically increased sentence length for fraud offenders

13   in the face of overwhelming social science research showing that such increases in severity have

14   little, if any, deterrent value. In promulgating the various sentence increases for fraud offenses

15   over the past twenty years, the Commission has offered no empirical data to rebut the virtual

16   consensus in the social science community disputing the deterrent value of such increases.

17   Offenders like Mr. Nguyen thus face sentences generally of seven times greater than called for by

18   the original guidelines even though they would be equally deterred by much shorter sentences.

19       **C.    The Large Number of Specific Offense Characteristics under § 2b1.1 Are**

20             **Cumulative And Fail to Accurately Reflect the Seriousness of the Offense.**

21       When the Guidelines were first adopted in 1987, the fraud guideline, then § 2F1.1,

22    provided just a small number of enhancements for specific offense characteristics. USSG §

23   2F1.1 (1987). Besides the amount of loss, the original § 2F1.1 imposed enhancements if the

24   offense involved (1) more than minimal planning; (2) more than one victim; (3) a

25   misrepresentation that the defendant was acting on behalf of a charitable, educational, religious

26   or political organization or government agency, (4) the violation of a judicial or administrative

27   order, or (5) the use of foreign bank accounts/transactions to conceal the nature or extent of the

28   fraudulent conduct. In short, the original fraud guideline provided only six possible

1  enhancements above the base offense level.

2      Twenty years later, § 2B1.1 – the current fraud guideline – includes nearly thirty different

3  enhancements for specific offense characteristics. USSG § 2B1.1 (2008). And yet, "the

4  [Sentencing] Commission has never explained the rationale underlying *any* of its identified

5  specific offense characteristics, why it has elected to identify certain characteristics and not

6  others, or the weights it has chosen to assign to each identified characteristic." *United States v.*

7  *Adelson*, 441 F. Supp. 2d 506, 510 (S.D.N.Y. 2006) (quoting Kate Stith & José Cabranes, *Fear*

8  *of Judging: Sentencing Guidelines in the Federal Courts* 69 (1998)). Furthermore, the

9  Commission has failed to address the problem that many of these factors replicate or overlap

10  with the loss concept, with one another, and with further upward adjustments in Chapter 3.

11      In its *Fifteen Year Report*, the Commission acknowledged that "as more and more

12  adjustments are added to the sentencing rules, it is increasingly difficult to ensure that the

13  interactions among them, and their cumulative effect, properly track offense seriousness."*Fifteen*

14  *Year Report* at 137. But the Commission has done nothing more than identify the risk of what it

15  labeled "factor creep"; it has not taken any action to evaluate which factors might be cumulative

16  and whether its ever-expanding scheme of sentencing factors under § 2B1.1 produces sentences

17  greater than necessary to achieve the goals identified in 18 U.S.C. § 3553(a).

18      Though the Commission itself has failed to remedy the problem of "factor creep," an

19  increasing number of courts have declined to sentence within guideline ranges that are the

20  product of overlapping specific offense characteristics. *See, e.g.*,*United States v. Lauersen*, 362

21  F.3d 160, 164 (2d Cir. 2004) (subsequently vacated in light of *Booker*) (upholding departure to

22  mitigate effect of "substantially overlapping enhancements" at the high end of the fraud

23  sentencing table); *Adelson*, 441 F. Supp. 2d at 506, 510; *United States v. Parris*, 573 F. Supp. 2d

24  744, 745 (E.D.N.Y. 2008) (complaining that guidelines in security fraud prosecutions "are

25  patently absurd on their face" due to the "piling on of points" under § 2B1.1). In *Adelson*, for

26  example, the district court found that the "calculations under the Sentencing Guidelines lead to a

27  result [ *i.e.*, an effective life sentence] so patently unreasonable as to require the Court to place

28  greater emphasis on other sentencing factors to derive a sentence that comports with federal

11

1  law." 441 F. Supp. 2d at 506. The *Adelson* court criticized the Commission for failing to explain

2  "the rationale underlying *any* of its identified specific offense characteristics" under the fraud

3  guideline and characterized § 2B1.1's overlapping enhancements as an irrational "piling on of

4  points." *Id*. at 510.

5        Furthermore, a growing chorus of legal scholars have offered their own criticism of the

6  increasingly harsh sentences that result from the large number of specific offense characteristics

7  inevitably present in every high-dollar corporate fraud case. Professor Frank Bowman, for

8  example, explains that "[m]any factors for which loss was already a proxy not only have been

9  given independent weight but also impose disproportionate increases in prison time because they

10  add offense levels on top of those already imposed for loss itself and do so a the top of the

11  sentencing table where sentencing ranges are wide." Frank O. Bowman III, *Sentencing High-Loss*

12  *Corporate Insider Frauds After Booker*, 20 Fed. Sent. R. 167, 170, 2008 WL 2201039, at *7

13  (Feb. 2008). As a result, Bowman adds, "[a]ny case involving a corporate officer and a

14  multimillion-dollar fraud will almost always trigger application of multiple offense-level

15  enhancements that have the effect of punishing the defendant over and over for the same basic

16  thing – conducting a big fraud in a corporate setting." *Id.* The same rationale applies to cases that

17  are internet based, as this one, the number of victims is impacted, the number of contacts are

18  impacted, and to effect the creation of blank cards a machine is needed, and these three factors

19  effect the amount of loss thereby constituting a piling on of offense levels when these factors

20  have truly been considered in the loss level.

21        **D.**    **Four of the Five Characteristics Impose on Mr. Nguyen Under the Current**

22                 **Loss Table Were Not Based on Any Kind of Empirical Evidence or Policy**

23                 **Basis, and Do Not Further Any Legitimate Purpose of Sentencing.**

24        Under the original Guidelines, adopted in 1987, 11 points would have been added to Mr.

25  Nguyen's offense level for the amount of alleged loss caused by his fraudulent acts. USSG §

26  2F1.1 (1987). Twenty years later, under the 2008 Guidelines, 20 points are being added for the

27  same amount of loss. USSG § 2B1.1 (2008). As a result of this 9-point increase Mr. Nguyen is

28  subjected to many additional years of imprisonment.

1    The Commission adopted its loss-table amendments without any empirical basis. Two

2    separate amendments – 154 and 617 – are responsible for the bulk of the increase to the loss

3    table. For an amount of loss between $7 and $20 million – as in Mr. Nguyen's case –

4    Amendment 154 added 4 additional points, while Amendment 617 added 3 points. In support of

5    Amendment 154's substantial increase to the loss table, the Commission stated only that it

6    sought to conform the fraud loss tables to the tax evasion tables and "increase the offense levels

7    for offenses with larger losses to provide additional deterrence and better reflect the seriousness

8    of the conduct." USSG, App. C, Amend. 154 (Nov. 1, 1989). And, in adopting the substantial

9    increases in Amendment 617, the Commission claimed it was responding to "comments received

10   from the Department of Justice, the Criminal Law Committee of the Judicial Conference, and

11   others, that [the fraud guideline] under-punish[es] individuals involved in moderate and high loss

12   amounts, relative to penalty levels for offenses of similar seriousness sentenced under other

13   guidelines." USSG, App. C, Amend. 617 (Nov. 1, 2001).

14        The explanations offered by the Commission for the two amendments are both deficient

15   and faulty. In each instance, the Commission failed to provide any empirical data to support

16   higher sentences for fraud offenders who typically have no criminal history and an exceptionally

17   low recidivism rate. The Commission ignored the overwhelming social science research,

18   discussed at length above, demonstrating that increases in sentence severity, as opposed to

19   certainty, have virtually no deterrent value. Second, in adopting Amendment 154, the

20   Commission sought to conform the fraud loss table with the tax loss table without explaining

21   why the tax loss table should itself be a model. Furthermore, though the Commission cited

22   comments from the Justice Department and the Criminal Law Committee in support the higher

23   sentences adopted through Amendment 617, it ignored clear feedback from the district courts.

24   Though the Guidelines explicitly allow for *upward* departures when the amount of loss does not

25   "fully capture the harmfulness and seriousness of the conduct," *see* USSG § 2F1.1 app. note 11

26   (2000) *and* USSG § 2B1.1 app. note 14 (2000), the sentencing courts granted upward departures

27   in less than 1 percent of § 2B1.1 cases and only 1.2 percent of cases under § 2F1.1 in the year

28   2000. *See* U.S. Sentencing Commission, *2000 Sourcebook of Federal Sentencing Statistics,* tbl.

1   28 (2000). This feedback – from the institutional actor best suited to make individualized

2   sentencing determinations – completely contradicted the recommendations of entities like the

3   Justice Department. Finally, in adopting Amendment 617, the Commission relied on the

4   argument that the existing loss table resulted in sentences lower than the penalty levels for

5   offenses of similar seriousness. The Commission failed to point out which offenses it deemed to

6   be of comparable seriousness to high-loss fraud. The end result of its increases under § 2B1.1

7   have, however led to the absurd result that, nonviolent fraud offenders are subject to sentences as

8   high as, and sometimes even higher than, those imposed on the most violent offenders (*e.g.*,

9   sentences for kidnaping, arson, high volume drug trafficking, and voluntary manslaughter).

10      Moreover, though the Commission has made the amount of loss the determinative factor

11  in the offense level calculation for fraud offenders, loss amount is a highly imperfect measure of

12  the seriousness of the offense. *See United States v. Adelson*, 441 F. Supp. 2d 506, 509 (S.D.N.Y.

13  2006) (criticizing "the inordinate emphasis that the Sentencing Guidelines place in fraud on the

14  amount of actual or intended financial loss" without any explanation of "why it is appropriate to

15  accord such huge weight to [this] factor[ ]"). The specific amount of loss is often "a kind of

16  accident" and thus "a relatively weak indicator of [ ] moral seriousness . . . or the need for

17  deterrence." *See United States v. Emmenegger*, 329 F. Supp. 2d 416, 427-28 (S.D.N.Y. 2004).

18  Most defendants do not set out to defraud a specific amount of money; rather, the amount of loss

19  is dependent on the security procedures in place and the point in time when the ongoing fraud

20  happens to be detected. *Id.* As the *Emmenegger* court explained: "Had [the defendant] been

21  caught sooner, he would have stolen less money; had he not been caught until later, he would

22  surely have stolen more." *Id.*

23      In short, the Commission failed to fulfill its institutional role of considering empirical

24  evidence when making the amount of loss central to its fraud guideline and then repeatedly

25  increasing the amount of points imposed for specific loss amounts. The resulting fraud guideline

26  is, therefore, entitled to no deference. This Court should look to the all of the § 3553(a) factors,

27  and the empirical data not considered by the Commission, in fashioning a sentence "sufficient,

28  but not greater than necessary" to fulfill the various purposes of sentencing.

1    **E.    A Variance Is Needed to Avoid Unwarranted Sentencing Disparities Between**
2    **Mr. Nguyen and Similarly Situated Defendants Who Have Received**
3    **Substantial Variances from Other Courts.**

4    Both the Sentencing Commission and the sentencing courts are directed to avoid

5    unwarranted sentencing disparities among the many defendants with similar criminal

6    backgrounds convicted of similar criminal conduct. *Rita v. United States*, 127 S. Ct. 2456, 2463

7    (2007) (citing 18 U.S.C. § 3553(a) and 28 U.S.C. § 991(b)). The Commission performs its

8    function "at wholesale," while the district court performs its function "at retail." *Id.* Ideally, the

9    two entities should have a symbiotic relationship, with the sentencing court taking the guidelines

10   into account in its § 3553(a) analysis and the Commission considering feedback from the courts,

11   in the form of departures and variances, when making its regular revisions to the guidelines. *See*

12   18 U.S.C. § 3553(a)(4) (requiring that sentencing court consider the guidelines' recommend-

13   ation); *see also Rita*, 127 S. Ct. at 2464 (explaining that "[t]he statutes and the Guidelines them-

14   selves foresee continuous evolution helped by the sentencing courts and the courts of appeals"

15   with the courts departing or varying in individual cases and the Commission "collect[ing] and

16   examin[ing] the[se] results").

17   In making its own effort to avoid unwarranted sentencing disparities – as required by 18

18   U.S.C. § 3553(a)(6) – the sentencing court is expected to concern itself more with national

19   disparities among similarly situated defendants than with the narrower consideration of equity

20   between defendants charged under the same indictment. *United States v. Simmons*, 501 F.3d 620,

21   623-24 (6th Cir. 2007). The sizeable chart, Exhibit A, referenced earlier in this sentencing

22   memorandum is, therefore, of particular importance. The chart highlights a large sample of cases

23   from districts across the country where defendants in high-loss fraud cases have received

24   sentences substantially below their guideline ranges. None of the defendants included in this

25   chart received any sentencing benefit based on cooperation. As corporate fraud defendants

26   responsible for substantial losses

27   In its recent decision in *United States v. Parris*, the District Court for the Eastern District

28   of New York took a similar collection of cases into account in fashioning an appropriate sentence

15

1   for two securities fraud offenders. 573 F. Supp. 2d 744 (E.D.N.Y. 2008). At the court's request,

2   each party submitted a sample group of cases to illustrate the sentences imposed in other

3   securities fraud cases. *Id*. at 752. Based on these samples, the court concluded that "[t]hose

4   [defendants] who were not cooperators and were responsible for enormous losses were sentenced

5   to double-digit terms of imprisonment (in years); [while] those whose losses were less than $100

6   million were generally sentenced to single-digit terms." *Id.* at 753. The court took this national

7   pattern into account in arriving at a sentence of just 60 months for the two defendants who each

8   faced an advisory guideline range of 360 months to life. *Id.* at 745.

9        The national sentencing trend exemplified by Exhibit A should, therefore, be taken into

10  account by this Court. And, to avoid unwarranted – and unfair – sentencing disparities between

11  Mr. Nguyen and the many defendants highlighted in the chart, this Court should grant a variance

12  or departure of similar magnitude in Mr. Nguyen's case.

13  **IV. SPECIFIC GUIDELINES CALCULATIONS OBJECTIONS**

14       Defendant seeks a hearing on the alleged facts upon which the guidelines have been

15  calculated. The original objections filed by prior counsel contested the PSR's factual findings in

16  every aspect. Defendant reasserts these factual allegations and in addition asserts some additional

17  factual and legal objections. These factual and legal objections will be coordinated and

18  enumerated according to the PSR paragraph.

19

20  **1. FACTUAL OBJECTIONS**

21       Paragraph 16 enumerates the GE Money/WalMart frauds and states that the loss was

22  approximately $193,000 when paragraph 37 enumerates a claim of loss of $605,748.83. There

23  appears to be a substantial unexplained variance. Perhaps what is even more enlightening about

24  the GE/WalMart  loss allegation is, the discovery provided to counsel and probation specifically

25  states "There does not appear to be a way to definitively identify specific fraud transactions

26  specific to defendant Tien Nguyen."

27       To further support this conclusion, discovery at page 362 supports the contention that not

28  all losses are attributable to defendant Nguyen nor can they be specifically connected to the

1  defendant. The investigative officers report reflects the following:

2          "Ryan (the confidential informant) and Stefani told me that <u>there were as many as</u>

3          <u>ten other people in California doing this crime</u>. They told me that Ryan met Tim

4          on line and Tim introduced them online to some guys in Romania. The

5          Romanians are big into Spamming and Phishing. They (meaning the Romanians)

6          would send her (Ryan Price and Stephani Ruland)  lists of names with all the

7          personal information."

8          In addition the amount of restitution cited in the PSR is not specific as to the actions of

9  the defendant but rather a summary of all losses as a result of this type of scam.

10         Page 366 relates officers observations and reflects the amount of $193,000 was compiled

11 from a list that included all fraud, not just that fraud attributed to defendant.

12         "I have been reviewing the documentation supplied to me by GE Money and Wal-

13         Mart. I have identified several hundred victims from the documentation. Stefanie

14         told me that on most occasions she buys gift card in excess of $500.00 when using

15         the instant credit of others because she then cashes or sells the cards for instant

16         money. I had Henkel run a report of all gift cards purchased in excess of $500.00

17         for the last year using Wal-Mart credit from all the stores that Stefanie admitted to

18         going to. Henkel e-mailed me the list. The total number of gift cards that fall into

19         that range was over one hundred. I then asked Henkel to locate and provide me

20         with video tapes or recordings of all the transactions that are available. Henkel

21         told me that stores that have digital recording will have sixty days of footage and

22         the stores that have video tape recordings will have thirty days of footage. He

23         agreed to compile all that information and forward it to me by 09-11- 06. <u>The total</u>

24         <u>dollar amount of just these transactions was over $193,000.00.</u>"

25

26         Paragraph 37 enumerates losses to Fairwinds Credit Union of $229,748.83. In the victim

27 and loss summary supplied to counsel and probation the investigator specifically states as it

28 relates to Fairwinds loss, "There does not appear to be a way to definitively identify specific

17

1  fraud transactions specific to defendant Tien Nguyen."

2      As to the losses enumerated in the paragraphs 16 and 37, it is clear that defendant can not

3  be definitively connected to the loss amounts. There is no doubt that Mr. Nguyen is not the only

4  person to participate in the alleged fraudulent acts against WalMart and Fairwinds and the court

5  should not consider him responsible for all the loss alleged. As presented there is no proof that

6  Nguyen is linked to the extent of the losses alleged. The courts factual finding in this matter will

7  effect the guidelines range and orders of restitution, however the evidence provided lacks

8  sufficient reliability to link defendant to the loss.

9      Finally, the Fairwind restitution document attached reflects $60,000 in additional loss due

10  to processing, telephone calls, copies. Without documentation to establish this loss, since it is

11  ancillary, the fee looks suspiciously like an educated guess. As such there is insufficient evidence

12  to base a court order for this additional amount.

### 2. LEGAL OBJECTIONS

15  CALCULATIONS OF LOSS

16  **Paragraph 47**.  Defendant objects to the "estimated loss" of $18,900,000. This value is

17  not supported by the facts nor is it the intended loss.

18      The calculation of loss, for the purposes of calculating the guidelines is "the intended loss

19  as reasonably foreseen by the defendant to have occurred." U.S. v Santos, *527 F.3d 1003*, page

20  1006, "The sentencing guideline governing fraud and theft offenses provides for incremental

21  increases in the defendant's offense level based upon the amount of loss. *See U.S.S.G. §*

22  *2B1.1(b)(1)*. The commentary accompanying this provision defines "loss" as "the greater of

23  actual or intended loss," *id. § 2B1.1 cmt. n. 3(A)*, with "actual loss" defined as "the reasonably

24  foreseeable pecuniary harm that resulted from the offense," *id. § 2B1.1 cmt. n.3(A)(I)*, and

25  "intended loss" defined as "the pecuniary harm that was intended to result from the offense,"

26  including "intended pecuniary harm that would have been impossible or unlikely to occur," *id. §*

27  *2B1.1 cmt. n.3(A)(ii)*"

28      Although not a ninth circuit decision the case of *U.S. v Titchell*, 261 F.3d 348 (3rd cir.

2001), is instructive. Both the Titchell case and the case at bar have similar fact patterns. In the Titchell case the defendant expressed an opinion that the success rate of his scam was 3%, in the case at bar Mr. Nguyen expressed and opinion based upon his experience that the scam would have a 5% success ratio. The lower court in Titchell calculated the loss in this bulk mailing of bogus bills scam  as the total number of bills sent times the amount of the bill without considering the success rate or the intended loss of the defendant. The appellate court in Tichell vacated the sentence and remanded the case back to the lower court stating at page 11, and referring the Geevers (which is cited in Santos a ninth circuit decision cited below), "The resolution of this issue is controlled by Geevers, in which we exhaustively analyzed the concept of intended loss under *§ 2F1.1*. [4] According to Geevers, it is clear that a district court errs when it simply equates potential loss with intended loss without deeper analysis. This is because "the fraud guideline . . . has never endorsed sentencing based on the worst-case scenario potential loss," and "equating possible loss with . . . intended loss" is a "linguistic stretch" that we have previously rejected.(Citations omitted). Moreover, "intended loss refers to the <u>defendant's subjective expectation</u>, not to the risk of loss to which he may have exposed his victims." Id. Therefore, it is the government's burden "to prove intended, not possible, loss if it seeks to increase guideline levels faced by the defendant under *§ 2F1.1*." Id.

Probation elects to calculate the offense level of this case under a theory of "intended loss," actual loss either being too low, incalculable, or unprovable.

In order to calculate the intended loss, probation relies upon a spreadsheet created by the government which reflects a finite number of "access devices," then multiplies that number by $500 as set forth in the guidelines. This approach is very similar to that of the lower court in Titchell. As noted this approach was rejected.

Upon review of the PSR and the discovery, it appears these "access devices," referenced by probation, for the most part, are based upon lists of names and corresponding statistical information.

Defendant objects to the number of access devices calculated as excessive and not consistent with 1. Defendants intended loss. 2. The spreadsheet which is the foundation for the

1   number of access devices clearly repeats the same persons and statistical data or inaccurately

2   reports numbers that are not real numbers. 3. Nor has the number of access devices  been proven

3   to be capable of being used to access an account (this can be determined by using bank

4   algorithms to determine if the account numbers would even fit the criteria to match an account),

5   4. Finally and most importantly, evidence contained within the PSR itself and supported by the

6   government's own witness reflects that the intended loss was more consistent with a 1 to 20

7   ratio. (See paragraph 5, page 4 in which the probation officer reflects facts to support this rate of

8   success. Also see Exhibit C-3.

9        The government bears the burden of proving loss for the purposes of *§ 2B1.1* by a

10   preponderance of the evidence. *United States v. Zuniga, 66 F.3d 225, 228 (9th Cir. 1995).*

11   However, the district court is not required to calculate loss "with absolute precision," *Zolp, 479*

12   *F.3d at 719*, but "need only make a reasonable estimate of the loss," *U.S.S.G. § 2B1.1 cmt. n.3(C)*

13        In Santos, above cited the case of Geevers, *United States v. Geevers, 226 F.3d 186 (3d*

14   *Cir. 2000)*,  was discussed and although out of the district, the ninth circuit found it instructive.

15   The issue raised dealt with the calculations of intended loss when fraudulent checks were

16   deposited into a newly opened account. Defendant in this case argued he did not intend nor expect

17   that he would get the full amount of the check deposited therefore the court should not consider

18   the full amount as proof in calculating the intended loss value. Unfortunately, Geevers never

19   offered any evidence as to the intended loss. The distinction that can be drawn between the case at

20   bar is in the case at bar, probation and the defendant has in fact supplied the court with the

21   intended amount of access devices that the defendant could reasonably expect to be used in

22   furtherance of the scheme to which he plead guilty.

23        In Geevers at page 194, as cited by Santos, supra, the court stated, "The district court may

24   not "mechanically assume" that the face value of the stolen checks is the intended loss, however.

25   Rather, it must consider the evidence, if any, presented by the defendant tending to show that he

26   did not intend to produce counterfeit checks up to the full face value of the stolen checks." Taken

27   in the light of the facts in this case, this statement could be interpreted to mean, the court should

28   not just count the number of access devices, but must rather determine the number of access

1  devices that defendant could reasonably expect to use.

2      Defendant contends that the number of access devices has not been proven. Discovery has

3  been provided in the form of a spreadsheet purportedly to enumerate all access numbers.

4      This spreadsheet purportedly was created to make sure that there are no repeat numbers

5  which would avoid double counting. The spreadsheet consists of 842 pages of which 40 where

6  supplied on paper. Counsel has reviewed the 40 paper pages of this spreadsheet for repeat

7  numbers and has denoted quite a few repeats. Just this one factor raises issues of accuracy.

8      Counsel undertook some simple online research to determine if the numbers found in the

9  spreadsheet were in fact usable credit card numbers. In an article entitled, *Anatomy of Credit Card*

10 *Numbers*, attached and made Exhibit B,  counsel found that an algorithm could be used to

11 determine if the credit card could possibly be used. This algorithm did not guarantee that the card

12 would be good it simply confirmed that the number could be valid. In applying "Luhn's algorithm

13 "to a sampling of numbers found in the 40 pages of the paper spreadsheet claimed to be access

14 card numbers it was easy to see some of the numbers would not even pass the Luhn Algorithm

15 screening test. Once again raising a question of the accuracy of the spreadsheet count.

16     The spreadsheet was viewed for numbers that also had letters in them. Letters are not

17 considered to denote valid credit card numbers. This character was also noted in the spreadsheet.

18 Additional anomalies in the spreadsheet raise question as to its accuracy and consistency.

19 Inconsistent enumeration of numbers, letters existing in the enumerated number, some numbers

20 had space every fourth number some did not, some numbers were found to be out of order

21 although the spreadsheet was represented to be in numerical order. Some numbers were

22 incomplete as found on the first column of the spreadsheet.

23     The spreadsheet, provided electronically, covered 842 pages and the paper spreadsheet that

24 I reviewed covered only forty of those pages. The sampling that counsel did was much less than a

25 review of the full forty pages of the spreadsheet.

26     Probation argues that the number of access devices, ie 37,800 could be even higher and

27 states in it's response to counsel that the loss "could be much higher had the pin numbers

28 associated with the access devices and the stolen credit profiles been counted". Defendant's

1  position to this response is that as such this would be "double counting", in that they  they

2  substantially overlap and count the same event two or three times.

3       The Jackson case illiterates how one act can generate multiple overlapping guideline

4  calculations.

5       *United States v. Jackson*, 346 F.3d 22 (2d Cir. 2003) (in credit card fraud, multiple

6  overlapping enhancements can justify a downward departure because "although the enhancements

7  imposed by the District Court are permissible, they are all little more than different ways of

8  characterizing closely related aspects of Jackson's fraudulent scheme . . . . Even though these

9  enhancements are sufficiently distinct to escape the vice of double counting, they substantially

10  overlap. Most fraud schemes that obtain more than one half million dollars involve careful

11  planning, some sophisticated techniques, and are extensive." "Moreover, a phenomenon of the

12  Guidelines, graphically illustrated by this case, is that any one enhancement increases the

13  sentencing range by a far greater amount when the enhancement is combined with other

14  enhancements than would occur if only one enhancement had been imposed.".

15       It is argued that this double counting may have produce a sentence greater than necessary

16  to achieve the § 3553(a) sentencing goals.

17       Defendant contends the correct number of access devices has not been proven. For the

18  purposes of this court however if it has been determined by this court that the correct number is

19  37,800 then the number of access devices should be reduced a ratio of 1 in 20 or 5% as denoted in

20  both the PSR and the chat logs attached as Exhibit C1-C4 and made a part of the record.

21       Discovery also supports the defendants interpretation of his reasonable expectation found

22  at page 228:

23            "Price said that Nguyen gave him about 20 cards and told him to go to AMPM

24            Arco gas stations and try to get them to work. Price said that very few of the cards

25            would actually work . . . "

26       Ex C-3, a chat log dated August 2, 2006 between defendant and Ryan Price, reflects on

27  page 2 in the center what defendants expectation of success is, "now only 5% work still".

28       The one in twenty ratio is accurate and reflects the defendant's subjective intent as

1    supported by discovery. Assuming arguendo, 37,800 is an accurate provable number of access

2    devices attributable to the defendant, then the  number of access cards should be calculated as

3    follows: .05 x 37,800 = 1890 access cards. The loss then would be 1890 x $500 = **$945,000.00**.

4    This calculation would result in an increase of **14** levels rather than the 20 levels presently applied

5    by the PSR

6        **Paragraph 48.** The application of 2 additional levels for more than 10 victims per

7    2b1.1(b)(2)(a) is not correctly applied and interpreted nor is it supported by the guidelines. The

8    increase is also cumulative and fails to accurately reflect congressional intent.

9        Victim as defined in the commentary is defined as "(A) any person who sustains any part

10   of an <u>actual loss</u> determined under subsection (b)(1)". There is no evidence that there exists more

11   than 10 actual victims who suffered actual loss. Probation now contends that the banks are victims

12   and that there is in excess of ten.

13       In *U.S. v Pham*, 545 F.3d 712, (2008). the appellate court addresses this issue precisely as

14   found at page 716-717,"The commentary to § 2B1.1 further provides that a "victim" is any person

15   who either (a) "sustained any part of the actual loss determined under subsection (b)(1)"; or (b)

16   "sustained bodily injury as a result of the offense." USSG § 2B1.1 cmt. n. 1. "Actual loss" is in

17   turn defined as "the reasonably foreseeable pecuniary harm that resulted from the offense." *Id.* n.

18   3(A)(I). "Pecuniary harm" means "harm that is monetary or that otherwise is readily measurable

19   in money" and "does not include emotional distress, harm to reputation, or other non-economic

20   harm." *Id.* n. 3(A)(iii). For such pecuniary harm to be "reasonably foreseeable," the defendant

21   must have known, or under the circumstances reasonably should have known, that such harm was

22   a potential result of the offense. *See id.* n. 3(A)(iv). Finally, the Guidelines provide that loss "shall

23   not include [either] [i]nterest of any kind, finance charges, late fees, penalties, amounts based on

24   an agreed-upon return or rate of return, or other similar costs[,]" or "[c]osts to the government of,

25   and costs incurred by victims primarily to aid the government in, the prosecution and criminal

26   investigation of an offense." *Id.* n. 3(D)."

27       The case of *Pham* above cited is instructive on the issue of double counting and

28   determination of just who is a victim and under what circumstances and what evidence is required

1  to sustain the governments burden.

2      Unless the government can prove actual monetary loss as defined in *Pham* for each bank

3  they can not meet their burden of proof. Presently there are only two victim impact statements

4  filed to support any loss what so ever, therefore the two level enhancement should not apply.

5      **Paragraph 52:**  3B1.1(c) Adjustment for Role in the Offense.

6      Defendant objects to the application of this adjustment as unfounded and unsupported.

7  Defendant was in a buyer-seller relationship and did not recruit Ruland and Price nor did he direct

8  their activities. He simply sold credit card numbers and a credit card reader writer to these two

9  individuals who were in turn to pay him money for the production of these items.

10     Commentary notes in 3B1.1 note four in part states, " The adjustment does not apply to a

11 defendant who merely suggests committing an offense." The acts of Ruland and Price were

12 completely controlled by them, not the defendant. Defendant plead guilty to conspiracy between

13 Ruland and Price because defendant simply sold credit card numbers for which he would be paid

14 knowing that the supplying of these numbers would translate into fraudulent activity on the part of

15 Ruland and Price.

16     Analysis of this finding of leadership is fact driven and in this case is based upon the

17 statements of the informant Price. However, Mr. Price is unreliable as reflected in the agent's

18 statements cited below and as such the court should consider his lack of credibility in it's

19 consideration of the finding.

20     Discovery page 237 addresses the poor credibility of Ryan Price.

21         On 12/29/06, I met with Detective Jim Hudson of the Placer County Sheriff's

22         office. Detective Hudson told me that both Ryan Price and Stefani Ruland have

23         been charged by the Placer County District Attorney for their involvement with the

24         fraud perpetrated against WalMart. Detective Hudson told me that Price had not

25         been forthcoming with his department with regards to the extent of his

26         involvement in this fraud and therefore he was charged.

27     Discovery page 420 explains the factual underpinning for the above statement regarding

28 Ryan's credibility:

24

On 9-25-06 at 1930hrs. I requested a meet with Ryan. Detective Glaspell and I met Ryan at Douglas and Sunrise; A warrant had been issued for Ryan. I also had some questions for him. Ryan has told me information about other suspect's involvement in this case <u>but he has not always told me the truth about his involvement</u>. I learned through interviews with other suspects today that Ryan had returned a computer to Wal-Mart after we met with him the first day in Sheridan. He used a receipt to obtain $1,000.00 for the computer. We met Ryan and asked him to tell me about this. Ryan denied this and then I told him I knew he had and he finally told me the truth. I have found with Ryan I have to convince him to tell me the truth and it damages his credibility. <u>Based on this I am no longer able to trust Ryan and he was arrested on the warrant</u>. He was transported to jail and booked.

The relationship between Ryan Price and the defendant, as stated in the officer's reports and chat logs  paints a different picture than the conclusion rendered by the probation report. Probation concluded  that defendant recruited Ruland an Price and directed their activities. To understand the relationship a chronology of events will help.

9-6-06 Police received information regarding Ryan Price and Stephani Ruland fraudulent WalMart Activities. P 226-227

9-7-06 Ryan Price and Stephani Ruland are contacted by police regarding fraudulent activities. p 227

9-11-06 Stephani arrested.

9-25-06 Ryan arrested p 420

Ryan Price was interviewed on 9-7-06 at that interview he stated he met the defendant about a year before, making their meeting date approximately September of 2005.

Defendant was arrested in Santa Ana, California on 11-1-05 (P. 222) making his presence in Sacramento after that date.

Ryan Price's statement from discovery page 227 reflects what Price said to officers about the first time he met the defendant.

Ryan Price told me that about one year ago he was in a Yahoo online chat room

25

1    using the moniker "916CRYSTALCLOUDS" when he met Tim Nguyen. Nguyen

2    was using the moniker "CASHOUT5050" and/or "DENISEKTRAN" monikers.

3    Nguyen indicated to Price that he was new to the Sacramento area from Orange

4    County, California and that Nguyen was looking for some one to help him obtain

5    Methamphetamine in the Sacramento area. Shortly after chatting with Nguyen

6    online, Price and Nguyen met at in a Wendy's parking.

7        To support the conclusion that there was a buyer-seller relation between Ryan Price and

8  defendant one merely has to look at the statements made by Ryan Price and Stephani Ruland.

9        Page 361 reflects independent actions on the part of Stephani Ruland and Ryan Price and

10  supports defendant's contention there was merely a buyer-seller relationship.

11    "Stefani told me the following in summary: For the last eleven months she has

12    been going to Wal-Marts around northern California and applying for instant credit

13    using compromised personal information from victims throughout the United

14    States. She has found a loophole in how instant credit is given and she exploits the

15    loophole. Stephani told me that she downloads personal information of the victim's

16    from the internet. <u>The information is given or sold to her by people in Romania</u>.

17    She and Ryan have met these people on the internet. Ryan was introduced to these

18    people by a guy he met named Tim Nguyen. These Romanian people gain the

19    information by phising. This is an internet term. <u>They have sold or given her</u>

20    <u>information that allows her to go to Wal-Mart and apply for instant credit at an</u>

21    <u>unmanned kiosk and then buy items and gift cards.</u>"

22        On discovery page 362 Stephani makes a statement regarding the WalMart scam and

23  admits she figured it all out herself. "While talking to Stepani she told me she was the one who

24  figured this all out. She told me she used to do all of this on line but that it was very difficult to do

25  it online now as they ask a lot more questions that she does not always have the answer for. So she

26  just goes in the store and does it."

27        It should be noted that Stephani had a lot of Walmart goods in her house as a result of this

28  scam while defendant's house when searched did not contain any identifiable WalMart items.

At page 427 the report reflects that Ryan Price had obtained the information he needed to do the WalMart scam independent of the defendant. In this report it seems that Ryan gave the Defendant credit card numbers.

"Tim told Ryan that these (numbers) were new and he has used them himself that week. Ryan then goes off line and uses the numbers that Tim gave him to put through a computer system. He checks the validity of the numbers somehow. He (Ryan) then responds to Tim by giving him full credit card numbers. Tim asks Ryan if he is sending yymm1010 his shares (Romanians). Ryan says yes. Tim tells Ryan to be nice to him as he is very good. Ryan told Tim that he has sent $1000.00 to yymm1010 so far. Tim told Ryan to be honest with yymm1010 as he is a good guy and good. Ryan told Tim that yymm1010 hooked Stepani up with Walmart profiles."

To further support that Ryan and Stephani were acting independently and that defendant was just one of their contacts, the forensic investigating officer developed the following:

> During the forensic exam Korbs (the forensic examiner) located several internet chats between the additional suspects. The suspects use screen names. One of these screen names is "Denisektran." This screen name is one of the screen names used by Tim. I reviewed over four hundred pages of instant message chat. On page thirty three of these online chats Tim and Ryan began a conversation. This discussion is on 08-13-06. They discuss credit card skimming and other related topic. They discuss that Tim is in "OC" meaning Orange County. Ryan asks Tim if he is still cashing out. This is slang. What Ryan is asking is if Tim is still using counterfeit cards to steal money from ATM's. Ryan asks Tim if he has any "bins." This is slang for credit card numbers. What Ryan is asking for is the first six numbers to a banks credit card numbers. With this info he can generate counterfeit credit cards. Ryan tells Tim he has been talking to one of the Romania's that Tim introduced him to. He identifies him by part of his screen name of yymm1010. Ryan asks Tim if the Romanian is still an okay guy. Tim tells him he is a good guy. Ryan tells Tim that a Romanian using a screen name of DHL is a fag. Tim appears to agree with

1   him. Ryan tells Tim that Stepani got arrested on a warrant the day before."

2   (Discovery P. 426)

3   Page 425 of discovery documents reveals that there are multiple suppliers of victim

4   profiles to Ryan not just the defendant. It establishes that Ryan is an independent actor. This

5   information bears upon the relationship of defendant as a seller-buyer as well as his relationship to

6   all the profiles. This statement raises doubt as to the accuracy of the number of access cards

7   attributable to the conspiracy and used to calculate loss. It also shows that Ryan Price used other

8   sources than the defendant to supply him with victim profiles.

9   I have been in contact with Secret Service Agent Korbs regarding the computer

10   that Ryan Price turned over to me. Korbs had obtained written permission from

11   Price to conduct a forensic exam of the computer. My purpose of the exam was to

12   assist with the investigation. This help would be in the form of finding additional

13   victims and to help determine the depth of the victims in this case. It was also to

14   help identify and prosecute additional suspects. <u>Throughout this investigation it has</u>

15   <u>been learned that the victim profiles used in this case came from several suspects.</u>

16   <u>Some of the suspects are in Romania</u>. One of the suspects identified has been Tien

17   Trong Nguyen. He has been identified in this report as "Tim" by Ryan and

18   Stephanie."

19   Finally Exhibits, C 1 through C4 support defendant's contention that he was not a recruiter

20   nor did he direct Ryan Price or Stephani Ruland.

21   Ex C–1 is a chat log dated June 10, 2006 in which Defendant asks Stephani how to

22   commit the WalMart fraud. Stephani sends defendant a sample of the instant credit slip that one

23   would receive from the WalMart kiosk. Stephani goes on to explain the fraud.

24   Ex C-2 is a chat log dated June 23, 2006 between the defendant and Stephani in which

25   Stephani asks defendant for some "new ones" meaning profiles, defendant responds by supplying

26   her some profiles to which she says, "dirty little helper" sent those to Ryan. "Dirty little helper" is

27   a Romanian. It should be noted that defendant did not ask for a share from the supplied profiles.

28   This chat reflects independent contact by Ryan and Stephani with Romanians and supports a

1  buyer-seller relationship theory with the defendant.

2        Ex C- 3 is a chat log dated August 2, 2006 between defendant and Ryan in which Ryan

3  discusses buying profiles from the Romanians. Defendant, Nguyen offers to sell him some

4  profiles establishing a buyer-seller relationship.

5        Ex C- 4 is a chat log dated August 13, 2006 in which Ryan tells the defendant that he has

6  been talking to yymm1010 (a Romanian), who has assisted Ryan in obtain victim information

7  where Ryan states,  "lil bit he helped me out some." Once again establishing the independence of

8  Ryan and Stephani.

9        Defendant has plead guilty in this case and accepted responsibility for his actions. He in

10  fact upon arrest accepted his responsibility and described to the officers at that first contact the

11  relationship he had with Ryan and Stephani. Defendant's statement to arresting officers correctly

12  states their relationship.

13        He met Ryan over the internet. Ryan was able to get Methamphetamine so Tim hooked

14        up with him. In exchange for the dope connect Tim began helping Ryan and later

15        Stephanie do identity theft. He would supply Ryan with 'bins. ' He allowed Ryan to do

16        what he wanted with them as long as Ryan kicked down money to him. Tim did not

17        introduce Ryan to the Romanians. Ryan and Stephanie key locked Tim's computer once

18        when he was with them and they captured his list of contacts. Tim told us he has been

19        dealing with the Romanians for awhile. He was familiar with screen names "Vortex",

20        "YYMMI 010", and "DHL." He told me he gets information from these names. Tim told

21        me that he makes sure he pays the Romanians when he is able to get something from the

22        information they provide....Tim told me he was happy this is finally over. He told me that

23        Ryan and Stepani always ripped him and the Romanians off. Tim allowed this to happen

24        because Ryan was able to get him Methamphetamine.

25        (Discovery P. 435)

26        The courts analysis is fact specific in this case for this paragraph. As a general observation,

27  the statements relied upon by probation in the PSR are those of a confidential informant, who later

28  was persecuted and for the police had lost his credibility due to his actions. As to the information

1   related to the confidential informant in this paragraph the court should consider the source as

2   something less than truthful in the past. Price's credibility is also addressed above.

3       Probation indicates in its response that co conspirators Price and Ruland did

4   independently run their own credit scam and obtained stolen credit card information from other

5   sources but because there is no evidence of their fraudulent activity before meeting the defendant

6   that somehow means that he recruited them into the business.  This is speculation at best without

7   foundation. As previously noted Stephanie Ruland had already figured out for herself how to run

8   the scam before meeting the defendant. The only reasonable inference from this fact is that Ruland

9   and Price had already engaged in credit card scams prior to meeting the defendant.

10      In the final analysis, the court simply does not have sufficient facts to support anything

11  further than a buyer/seller relationship. As previously argued, commentary 3B1.1, applies in this

12  case and as to the facts of this case, this role in the offence of two levels should not apply.

13  **Paragraphs 67 through 73 Criminal history**

14      Defendant objects to this calculation as either, 1. inaccurate since he claims recollection of

15  one state prison sentence for drug violations or, 2. Based upon the probations review of these

16  crimes defendant suffered three separate felony convictions in 1999 for which he received a state

17  prison commitments for each, the commitments occurred at the same time. Presently the total of

18  criminal history points applied to defendant is 10 this includes an increase of 3 for the

19  commitments to state prison. This increases the defendants criminal history by 30% which is a

20  substantial increase.  Defendant contends that the criminal history is overstated and should be

21  reduced by three levels. With three levels reduced the criminal history is IV not V.

22      United States Sentencing Commission, *Guidelines Manual*, § 4A1.3 (2005) "If reliable

23  information indicates that the defendant's criminal history category is substantially over-

24  represents the seriousness of the defendant's criminal history. . .a downward departure may be

25  warranted."

26  **SUMMARY OF CALCULATIONS**

27      Specific Offence Characteristics

28      2B1.1(b)(1) Base offence                                    **6**

2B1.1(b)(1)(I) -the number of access codes possessed should be 5% of the actual number established, assuming the number has been proven as being 37,500 the loss would be $945,000.00 and the increase under 2B1.1(b)(1)(I) would be

**+14**

2B1.1(b)(1)(2)(C)  no proof for number of victims exceeds 250.                    **0**

2B1.1(b)(1)(b)(9) increase for sophisticated means.                    **+2**

2B1.1(b)(1)(10)(I) no increase for possession and use of a device making equipment.   **0**

2B1.1(b)(14)(A) no increase because defendant did not personally receive over 1 mil.   **0**

3B1.1(c) no increase for recruiting others into a criminal activity = 0

                                                       **Subtotal 22**

Multiple count adjustment under section 3D1.4

|  | | |
|---|---|---|
| Adjusted offence levels counts 1-3 | 22 | 1 unit |
| Adjusted offence level count 5 | 0 | 0 |
| Adjusted offense level count 4 | 14 | ½ unit |
| Total number of units | | 1 ½ |

Greater Adjusted offense level                                        **22**

Increase in adjusted offense level                                        **1**

                                       Combined adjusted offense level

**23**

Chapter four adjustments - less acceptance of responsibility                    **-2**

                                       Total offense level     **21**

**CONCLUSION:**

Assuming criminal history is overstated the new criminal history is IV.

Criminal history IV level 21 is 57-71 months

Plus 24 months consecutive for aggregated id theft in count IV.

Assuming criminal history is V, level 21 is 70-87 months.

Plus 24 months consecutive for aggregated ID theft in count IV.

Defendant has been in custody in the Sacramento County Jail Since 1-26-07 or 4 years 5 month and 8 day from arrest to 6-30-11, the next court date set.

///////

//////

Based upon the totality of the circumstances, the extraordinary efforts towards rehabilitation exhibited by the defendant, defendant requests the court consider a sentence that meets all the needs of society and Congressional intent, time served.

Dated: June 20, 2011                    Respectfully submitted,


                                        /s/Dwight M. Samuel
                                        Dwight M. Samuel
                                        Attorney for Defendant, Tien Nguyen